Argued March 19, writ dismissed April 25, 1951

# STATE OF OREGON EX REL. THE PACIFIC TELEPHONE AND TELEGRAPH CO., A CORP.

## *v.*

# GEORGE R. DUNCAN, AS JUDGE OF THE CIRCUIT COURT OF THE STATE OF OREGON FOR THE COUNTY OF MARION

230 P. 2d 773

*Fletcher Rockwood* argued the cause for plaintiff. With him on the brief were Hart, Spencer, McCulloch, Rockwood & Davies, and Clarence R. Wicks, all of Portland.

*Eugene E. Laird,* Special Assistant Attorney General, argued the cause for defendant. With him on the brief were George Neuner, Attorney General, and Wallace G. Mills, Assistant Attorney General, all of Salem.

Before BRAND, Chief Justice, and HAY, ROSSMAN, LUSK, LATOURETTE, WARNER and TOOZE, Justices.

ROSSMAN, J.

This is a proceeding in mandamus which The Pacific Telephone & Telegraph Company, as relator, in-

stituted in this court for an alternative writ. Article VII, section 2, Constitution of Oregon, authorizes this court "in its own discretion" to "take original jurisdiction in mandamus." The defendant is the Honorable George R. Duncan, one of the circuit court judges for Marion County. Judge Duncan, on February 19, 1951, in a proceeding entitled *The Pacific Telephone & Telegraph Company, a corporation, plaintiff, v. George H. Flagg, as Commissioner of Public Utilities of Oregon, defendant,* entered an order which read:

> "It is hereby ordered that plaintiff's motion for a temporary restraining order, suspending the operation of defendant's Order No. 26346, be and the same hereby is denied."

That order is the sole object of attack in this proceeding.

The defendant, by way of denial and further return, presents these issues: (1) the motion for the temporary restraining order mentioned in the language just quoted was addressed to the discretion of the court, and the discretion was properly exercised; (2) the relator, if aggrieved by the challenged order, has a plain, speedy and adequate remedy in the ordinary course of the law.

The case was submitted to us upon stipulation of facts which we will later review.

The term "Order No. 26346", found in the quoted language, refers to a ruling made by the Commissioner of Public Utilities December 28, 1950, which suspended permanently a tariff filed by the relator April 18, 1950. That tariff set out a schedule of increased rates for the relator's intrastate telephone service. Had it become effective, it would have yielded annually $3,041,-000 gross revenue, or $2,731,000 net revenue.

It is seen from the foregoing that on April 18, 1950, the relator filed with the Commissioner a tariff for increased rates. After the Commissioner had given proper notice, he conducted a hearing upon the tariff extending from November 28 to December 2, 1950. December 28, 1950, he entered the order which is mentioned in Judge Duncan's order; that is, the order which permanently suspended the tariff. February 1, 1951, the telephone company, as plaintiff, instituted a suit in the Circuit Court for Marion County which named the Commissioner as the defendant and which prayed for a review of his order; that is, the order entered by the Commissioner December 28, 1950. On the same day that that suit was begun the company filed the motion which is mentioned in the order entered by Judge Duncan, from which we have quoted. Motions of that kind are authorized by § 112-4,120, O.C. L.A., which says:

"After the commencement of such suit the circuit court may, for cause shown, upon application to the circuit court or presiding judge thereof, and upon notice to the commissioner and hearing, suspend or stay the operation of the order of the commissioner complained of until the final disposition of such suit upon the giving of such bond or other security, or upon such conditions as the court may require. The said bond shall be executed in favor of the commissioner for the benefit of whom it may concern and may be enforcible by said commissioner, or any person interested, in an appropriate proceeding."

The suit instituted by the telephone company against the Commissioner is still pending in the circuit court.

The purpose of the proceeding filed in this court is to procure a writ of mandamus commanding Judge Duncan to vacate his order of February 19, 1950, and

issue an injunction pendente lite suspending the operation of the Commissioner's order of December 28, 1950. If the desired order is issued, the tariff filed by the company April 18, 1950, will become effective and remain so until the circuit court has disposed of the case filed by the company for the review of the Commissioner's permanent suspension of the tariff just mentioned. If the Commissioner's order is vacated at the conclusion of that suit, the tariff will remain in effect indefinitely.

We shall now review the parts of the petition filed in this court wherein the relator sets forth specifically the premises upon which it desires this court to issue the writ. In the language which we are about to quote, the term "defendant" refers to Judge Duncan, and the term "Suit No. 37571" means the suit instituted in the circuit court by the company against the Commissioner for a review of his order of permanent suspension. The petition alleges:

"The only evidence before defendant upon which he acted in making said order of February 19, 1951, consisted of relator's verified complaint in suit No. 37571, and the affidavits filed by relator and the affidavits filed by the Commissioner, copies of which documents are hereto attached, marked Exhibits I, V and VI."

"The authority of the defendant to grant petitioner's motion described in paragraph V hereof is contained in Section 112-4120, O.C.L.A."

"The evidence before defendant upon which he acted in ruling upon said motion established with certainty that the injury to relator would be certain and irreparable if said motion were denied and the final judgment and decree in said suit were in relator's favor, and that if said motion were granted there would be no injury to the telephone-using public in Oregon or to the Commissioner, even if

the final judgment and decree in said suit were in favor of the Commissioner in that any damage to the telephone-using public which might otherwise occur may be adequately indemnified by a bond which relator offered to file, in compliance with the provisions of Section 112-4120, O.C.L.A. Despite the facts as herein alleged, defendant in abuse of discretion made said order filed February 19, 1951, denying said motion of relator for an order suspending and staying operation of said Order No. 26346, until the final disposition of said suit No. 37571.''

Thus, this proceeding in mandamus is predicated upon a charge that Judge Duncan's order, which is the subject of attack, was entered in abuse of the discretion which § 112-4,120, O.C.L.A., contemplates the circuit court shall exercise when a motion for a temporary restraining order is submitted.

So as to make the issues clear, we revert to a statement made by us in a preceding paragraph; that is, the order under attack in this proceeding is the order entered by Judge Duncan February 19, 1951. That order did nothing more than deny a motion filed by the company for a temporary injunction, but if we grant the relator the relief it seeks, Judge Duncan will be commanded to vacate his order of February 19, 1951, and issue an injunction pendente lite which will suspend, until a final disposition of the case instituted by the company against the Commissioner, the latter's order of December 28, 1950. Upon the suspension of the Commissioner's order, the tariff filed by the relator April 18, 1950, will become effective. If the Commissioner's order is suspended, Judge Duncan will, of course, be authorized to exact of the company a bond of the kind mentioned in § 112-4,120, O.C.L.A. No appeal was taken from Judge Duncan's order and, so far

as we are advised, his order was not appealable: § 10-801, O.C.L.A.; *Anderson v. Harju,* 113 Or. 552, 233 P. 848; and *Breese v. Bramwell,* 102 Or. 76, 201 P. 729.

As stated in the parts of the petition which we have quoted, there was before Judge Duncan for his perusal when he made his order of February 19, 1951, the following documents: (1) the complaint filed in the cause pending before him (the telephone company v. the Commissioner); (2) fourteen affidavits filed by the plaintiff (the telephone company) in that cause; and (3) three affidavits filed by the defendant (the Commissioner) in that cause. Attached to the complaint (telephone company v. Commissioner) as exhibits were copies of the Commissioner's order and findings of fact. Those documents likewise constitute the sole evidence which has been submitted to us. The motion for the temporary injunction pendente lite was argued before Judge Duncan February 7, 1951, and was then taken under advisement. February 19, 1951, Judge Duncan denied the motion by entering the order which we have quoted.

The affidavits and the Commissioner's findings are lengthy and contain extensive data. We have read and studied carefully that material. The complaint (telephone company v. Commissioner) indicates that the Commissioner, before permanently suspending the tariff filed by the company April 18, 1950, gave notice to all concerned, conducted a four-day hearing and later, after entering findings of fact, entered his order. From the findings of fact, we quote the following:

"The first contention of Pacific as to its need for increase in rates is, that because of post-war expansion the ratio of equity capital to borrowed capital has become unfavorable from a standpoint of the financial soundness of the company. Imme-

diately subsequent to World War II the capital obligations of Pacific consisted of 20.9% debt capital and 79.1% equity capital. As of October 31, 1950, the capital obligations of the company consisted of approximately 42% debt capital and approximately 58% equity capital. It is contended by Pacific that in order to attract more equity capital it is necessary that the company earn a rate of return of 7½% on the rate base as determined in P.U.C. Oregon Order No. 19034 and P.U.C. Oregon Order No. 22180, so as to bring the earnings per share to approximately $11.50 to $12.00. This would provide for approximately $7.50 to $8.00 per share in dividends, with approximately $4.00 per share for surplus.

"This is indeed a novel approach to a rate problem. So far as is ascertainable, it is the first time a public utility has attempted to secure approval of increased rates by claiming that it can only sell its securities by increasing the value of its common stock at the expense of the rate payers.

"Although novel, this contention has been carefully considered. The evidence in this proceeding shows that Pacific is controlled by American through stock ownership and that American has consistently subscribed to approximately 90% of all stock issues of Pacific. Pacific has not seen fit to go to the general public to secure equity capital.

"The instant hearing is not the first time Pacific has sought rate relief since the end of World War II. In docket U-F-1277 proceedings were held which resulted in P.U.C. Oregon Order No. 19034, issued January 8, 1948. In docket U-F-1392 proceedings were held which resulted in P.U.C. Oregon Order No. 22180 issued May 27, 1949. Both of these orders granted increases in rates to Pacific. In both proceedings a rate of return to Pacific of 5.5% was held to be a reasonable rate of return."

We pause to observe that, according to an affidavit filed by the relator, the two rate increases just mentioned amount to a percentage increase of only 26%

since 1939. The increase under the suspended tariff would have been 9.8%. Thus, if that tariff had gone into effect, telephone rates would have increased 35.8% since 1939.

We continue our quotation from the Commissioner's findings:

"The second contention of Pacific is that the present rates do not yield a rate of return of 5.5% for the reasonably forseeable future. The evidence shows that the rate of return by months on an annual basis for the first 9 months of 1950 by Pacific in the State of Oregon is as follows:

| | |
|---|---|
| January | 4.36% |
| February | 5.27% |
| March | 6.30% |
| April | 6.18% |
| May | 5.67% |
| June | 6.45% |
| July | 6.77% |
| August | 6.00% |
| September | 6.64% |
| Monthly Average (Annual Basis) | 5.96% |

"It will be noted that the rate of return for the first 9 months of 1950 has been increasing.

"For the first 9 months of 1949 the rate of return by months on an annual basis was as follows:

| | |
|---|---|
| January | 2.74% |
| February | 3.07% |
| March | 2.65% |
| April | 3.51% |
| May | 3.09% |
| June | 5.47% |
| July | 5.48% |
| August | 6.34% |
| September | 6.37% |
| Monthly Average (Annual Basis) | 4.34% |

"A comparison of the operations for the first 9 months of 1949 and the first 9 months of 1950 demonstrates that the rate of return on an annual basis for the year 1950 is 1.62% higher than for the first 9 months of 1949.

"For the 12 months' period ending August 31, 1950, Pacific earned $8.55 per share on its common stock ($100.00 par value). Pacific earned $8.73 a share on its common stock for the first 9 months of 1950 annualized.

"Pacific attempted to overcome this evidence by estimates of future operations based partially on the opinion of various witnesses as to revenues to be earned in 1951 and costs to be expended in 1951. It is asserted by Pacific that because of a plan whereby Portland exchange service is to be extended out to include Oswego, Oak Grove and Milwaukie the company will lose revenues from toll operations in the area involved. It is possible that the company will lose some revenue from this extended area service. It is also certain that its costs in serving this area will decrease. It is asserted by Pacific that a wage increase granted June 1st, 1950, will, when applied to 1951 operations, increase the cost of rendering service. It is asserted by Pacific that the Federal income tax rate of 45% which goes into effect January 1, 1951, will increase the cost of rendering service. With this assertion there can be no disagreement. The more onerous tax burdens become, the more it will cost utilities to render service. The ordinary rate payer is bound to be affected by increased taxation of utilities just as if the money was being taken directly from his pocket.

"The fallacy of Pacific's assertion, however, that the three factors will result in a decrease in the rate of return to Pacific is that although it has taken three factors which are susceptible of mathematical precision, resort must still be had to estimates of future revenues and costs in order to arrive at the

ultimate result of what the rate of return will actually be for the reasonably foreseeable future.

"Guess work can not be employed by a regulatory body in arriving at a determination of rates where past and present operations and results are matters of record. Pacific is now making a rate of return of 5.96% on its Oregon operations. Under present economic conditions, with the threat of war time economy, of which official notice is hereby taken, the inescapable conclusion is apparent that inasmuch as Pacific is presently earning a reasonable rate of return it would not be common sense to base rates on estimates of a very uncertain and clouded future.

\* \* \*

"Pacific next asserts that although the rate of return for the first 9 months of 1950 is 5.96% on Oregon total operations that the rate of return is less when the results have been separated between interstate and intrastate operations. This assertion is correct. However, by the company's own exhibits the present rates have provided it with a rate of return of 5.6% after such a separation. In its case in chief Pacific first adjusted 1950 revenues and costs and then separated them. It has been found that the adjustments are premised on estimates of operations in a very uncertain and clouded future. It is found, therefore, that after such a separation is made the present rates yield a rate of return for the first 9 months of 1950 of 5.6% and that this rate of return is just and reasonable. It is unnecessary to decide, therefore, the question as to whether or not a separation should be made.

"It is found from the foregoing that a rate of return of 7½% as requested by Pacific is not just and reasonable. It is further found that a rate of return of 5½% as prescribed by P.U.C. Oregon Orders 19034 and 22180, is just and reasonable.

## "CONCLUSIONS

"That the present rates of Pacific yield a rate of return now and for the reasonably foreseeable future which is reasonable and that the present rates are just and reasonable.

"That the evidence adduced by Pacific in support of its proposed rates fails to meet the burden imposed upon it to show that said rates are just and reasonable.

\* \* \* ''

Since the findings entered by the Commissioner were a part of the documents which were submitted to the circuit court for its guidance in passing upon the motion for a temporary restraining order, the court, of course, could consider them. Although the relator does not agree with the Commissioner's conclusions, it does not challenge the facts which the findings recite.

We come now to the fourteen affidavits filed by the relator in support of its motion for a temporary restraining order. Virtually all of the facts recited in those affidavits were submitted to the Commissioner, although possibly in a different form.

According to an affiant who concerned himself with the matter, the cost of rendering telephone service has been on the ascendancy in recent years. For example, the maintenance expense for an average telephone increased in Oregon from $14.67 in 1940 to $25.32 in 1950. In the same period the company's investment per telephone in Oregon increased from $251.05 in 1940 to $342.45 in 1950.

The affidavits dwell at length upon the necessity which faced the relator at the close of World War II to expand its plant extensively. The construction of new and supplementary facilities in the four states in

which the relator operates had to be pursued in the face of ever-increasing costs of material and labor. In order to meet the obligations thus incurred, the company was forced to procure $566,821,700 new capital. In the preceding 68 years of operation by the relator and its predecessors, it was necessary to raise permanent capital to the extent of only $403,125,000. December 31, 1945, the company had outstanding debentures to the extent of $75,000,000 and short term notes aggregating $11,900,000. The total of those two items, $86,900,000, represented 20.9% of its capital. The other 79.1% was made up of $82,000,000 preferred stock and $246,125,000 common stock. In order to procure the aforementioned sum of $566,821,700 of postwar funds, the company sold $325,000,000 of long term debentures and $241,821,700 of common stock. The latter was sold at par value of $100 per share. In that manner long term debt obligations increased from $75,000,000 to $400,000,000, or 433%. Common stock increased from $246,125,000 to $487,946,700, or 98%. Although debt capital represented only 20.9% of the capital obligations prior to December 31, 1945, it rose to 43.3% at the conclusion of the aforementioned financing.

Approximately 90% of the company's capital stock is owned by the American Telephone & Telegraph Company. In the post-war period the company made four offerings of new issues of the company's common stock. Two of the offerings are described in the affidavits as unsuccessful. One of those two was made in 1948 when only 20.3% of the shares offered to shareholders other than the American company were taken. In 1949 only 14.7% of the shares offered to shareholders other than the American company were subscribed. The 1947

and 1950 offerings were deemed successful by the company.

In the meantime, while the company was procuring its additional needed capital to discharge the obligations arising from its unprecedented construction program, it was forced to draw heavily upon its surplus. The remaining surplus, which amounts to 1.2% of the company's capital, is deemed grossly inadequate.

It is seen from the foregoing that in the post-war period 57.3% of the company's new permanent capital was procured by the sale of long term debt obligations and only 42.7% by the sale of capital stock. Affidavits indicate that this form of financing has materially weakened the financial security of the company and has rendered its common stock less attractive to investors. The effect of the post-war financing has lowered materially the market value of the stock of the company, thereby rendering more difficult the sale of future issues at par.

In the year 1950 the company needed $49,700,000 of new capital. One of the affidavits declares:

"For 1950 and 1951 there will be required for the present construction program approximately $140,000,000."

According to the affiants who concerned themselves with the improvement of the financial structure of the company, the next $160,000,000 of the company's new financing must take the form of the sale of common stock. If effected in that manner, the percentage of the debt obligations of the company to its capital stock will be approximately 35%. Further affidavits indicate that the company's common stock can be rendered attractive to investors so as to assure subscription to new issues of common stock only by in-

creasing the net revenue of the company and, of course, those affidavits declare that the earnings of the company can be enhanced only by increasing telephone rates.

The above brings to a close our review of the affidavits submitted in support of the motion. The affiants, in many instances, were compelled to resort to estimates and surmises. The difficulty of forecasting the future is illustrated by the experiences of at least one of the affiants. The affiant whom we have in mind is an official of the relator whose duties required him to anticipate the effect of the Korean war upon the demands for telephone service. The subsequent realities forced him to revise downward his estimates.

The foregoing summary of the affidavits presented by the company is scant, yet we believe that it reflects the purpose which the affidavits were intended to serve.

In opposition to the motion for the temporary restraining order, the Commissioner filed three affidavits. The first states that, since the company filed its aforementioned tariff, it has not sought authority in any of the states in which it operates to sell any new issue of capital stock.

The chief accountant of the Commissioner subscribed to an affidavit, from which the following is quoted.

"That based upon financial and other reports filed with the Commissioner by months during the year 1950, The Pacific Telephone and Telegraph Company earned a return of 5.98% on the average net plant and working capital, State of Oregon, for the eleven months ended November 30, 1950, and for the same period the balance net operating revenues of The Pacific Telephone and Telegraph Company and Subsidiary was equal to a return of

5.79% on the average net plant and working capital for the eleven months ended November 30, 1950. That for The Pacific Telephone and Telegraph Company, the balance net operating revenues for the period May 1 to November 30, 1950, on an annual basis was equal to a return of 6% on the average net plant and working capital for the same period. That for the State of California the balance net operating revenues for the period March 1, 1950 to November 30, 1950 was equal to a return of 5.87% on the average net plant and working capital for the nine months ended November 30, 1950, and for the State of Washington the return for the nine months March 1, 1950 to November 30, 1950 on an annual basis was equal to a return of 6.25% on the net plant and working capital for the same period.

"That for the eleven months ended November 30, 1950 the total operating revenues, State of Oregon, was equal to approximately 9.17% of the total operating revenues of the Pacific System for the same period."

The third affidavit filed in opposition to the motion for a temporary restraining order mentions a source from which the company could obtain additional revenue in Oregon by filing a tariff.

The foregoing completes our summation of the facts which were submitted to Judge Duncan for his guidance when the motion for a restraining order pendente lite was presented to him.

This proceeding is one of mandamus. Our legislature, in 1862, codified many of the extraordinary remedies, including mandamus. As reduced to statutory form, mandamus

"may be issued to any inferior court, * * * to compel the performance of an act which the law spe-

cially enjoins, as a duty * * *; but though the writ may require such court, * * * to exercise its or his judgment, or proceed to the discharge of any of its or his functions, it shall not control judicial discretion. The writ shall not be issued in any case where there is a plain, speedy, and adequate remedy in the ordinary course of the law.''

Section 11-302, O.C.L.A.

Mandamus, under our statute, is a highly effective remedy in all instances where it is available, for §§ 11-310 and 11-312, O.C.L.A., equip the writ with biting goads. The former authorizes a court, when it issues a peremptory writ, to award damages, and the latter authorizes the court, whenever a peremptory mandamus is directed to a public officer, to impose a fine not exceeding $500, if it appears that the officer neglected to perform his duty.

■ The relator asks for the award of no damages, and likewise does not suggest the imposition of a fine. Our purpose in mentioning the two features of our statute which we just set out is prompted by a belief that they evince, in a measure, the conception which our legislature had of mandamus when it phrased our statute. Plainly, the legislature intended that mandamus should be an extraordinary remedy. Since the legislature subjected an official to whom a peremptory writ was addressed to both fine and damages, it restricted the use of the remedy only to instances involving ''the performance of an act which the law specially enjoins.'' In order to lessen the possibility of being misunderstood, our statute added the words that the writ should never be employed as a means of controlling judicial discretion.

Notwithstanding the express language of our statute, the relator's brief, in referring to the contentions of the Attorney General, says:

> "The basic principle of counsel's argument is erroneous. It is true, as a general rule, that mandamus will not lie to control the exercise of discretion vested in the circuit court, but counsel failed to recognize the exception to that general rule."

We pause to observe that the statute mentions no exception. The exception which the relator has in mind is denominated by its counsel as "abuse of discretion." The following are the local decisions upon which the relator's brief depends: *Riesland v. Bailey,* 146 Or. 574, 31 P. 2d 183; *State ex rel. v. Dobson,* 171 Or. 492, 135 P. 2d 794, 137 P. 2d 825; and *Casciato v. Oregon Liquor Control Commission,* 181 Or. 707, 185 P. 2d 246.

It is not unworthy of mention that those three decisions did not cite or mention our mandamus statute. The Dobson decision, however, quoted from *State ex rel. v. Slusher,* 117 Or. 498, 244 P. 540, 58 A.L.R. 114, a paragraph which cited the statute and which pertained to the availability of mandamus when no other remedy is adequate. The Dobson decision met with two dissents. We do not believe that the Casciato decision supports the relator's contention. That case was in no wise concerned with mandamus. It grew out of a liquor license cancellation. We do not believe that the majority decision in the Dobson case holds that mandamus is available as a means of controlling judicial discretion. The following is taken from the majority opinion:

> "The office of mandamus is to execute—not to adjudicate. The writ merely commands a hearing and determination by defendant as to whether the debtor owns property which could be applied in

satisfaction of the judgment. The decision of such issue is a judicial function which the writ does not seek to control.

\* \* \*

"The trial court had no judicial discretion to exercise as to whether the order of examination should be made. There was no dispute as to the facts. The judgment creditor's affidavit contained all of the averments required by § 6-1701, O.C.L.A., to obtain an order of examination and he was entitled to the same as a matter of law. No judicial discretion could have been involved when there was only one legal deduction that could have been made, \* \* \*."

The Riesland decision contains some statements which support the relator's contentions, but we believe that they were not necessary to a decision of the case. That opinion, as we have said, failed to mention our mandamus statute. Had the opinion been heedful of that statute, it possibly would not have made statements such as "It is not accurate to say that the writ will not issue to control discretion." That statement is directly contrary to the very words of the statute. The Riesland case was based upon the refusal of the county clerk of Multnomah County to approve an undertaking after the sureties had fully qualified. After they had met all of the statutory requirements, the clerk had no duty to perform except to approve the sureties. He refused to perform that duty. This court, therefore, held that the circuit court erroneously sustained a demurrer to the petition.

Whenever called upon to issue a peremptory writ of mandamus, this court has been heedful of the phraseology of the mandamus statute. See for instance, *In re Clark,* 79 Or. 325, 154 P. 748, 155 P. 187, and *State ex*

*rel. v. Ekwall,* 144 Or. 672, 26 P. 2d 52. The Ekwall decision said:

> "We know of no rule of law more firmly established both by statute and by decisions of this court than the rule that, so long as an inferior court or tribunal acts within the scope of its authority touching any matter about which it must exercise its discretion, its action cannot be revised by mandamus."

That decision cites and reviews several other decisions of this court. They expressed the same views as the language just quoted.

We shall review our decisions pertaining to mandamus no further. We are satisfied that a writ of mandamus as authorized by our statute is a command and nothing else. Such a writ is not a means of controlling judicial discretion or bringing about its appellate review.

The question now occurs as to whether or not the affidavits which were submitted in support of the motion for a temporary restraining order presented to Judge Duncan a case in which it was his clear duty to have issued the injunction, or whether the grant of the injunction was within his discretionary powers. We remind ourselves once more of the exact words of § 11-302, O.C.L.A., which defines the duty which the writ can order performed. Those words are, "an act which the law specially enjoins, as a duty resulting from an office." The precautionary words which the legislature inserted for the purpose of making its meaning manifest are "it shall not control judicial discretion." Therefore, unless it was Judge Duncan's clear duty to have issued the injunction, this proceeding cannot be maintained.

As we saw when we quoted § 112-4,120, O.C.L.A. (the section of our laws which authorizes the issuance of temporary restraining orders in instances of this kind), that section says: "The circuit court may, for cause shown, * * * suspend or stay the operation of the order of the commissioner * * *." It will be observed that the permissive words "may" is used and not a peremptory word such as "must."

Other legislation, which regulates the award of injunctions, uses a permissive and not a mandatory verb. See §§ 9-402 and 9-404, O.C.L.A.

Accordingly the statutes pertaining to the issuance of injunctions did not prescribe for Judge Duncan "an act which the law specially enjoins," but to the contrary invested him with a discretionary power.

■ No citation of authority is necessary to warrant the statement that a motion for a temporary restraining order is addressed to the discretion of the court. The decision of the early case of *Burton v. Moffitt,* 3 Or. 29, commences with these words: "This is an application for a preliminary injunction." After it had reviewed the facts which governed the application, the decision said, "it will be a proper exercise of the discretion of the court to refrain from making an order until after final hearing."

The relator itself recognizes that a motion for an injunction pendente lite is addressed to the discretion of the court, for its brief quotes the following from *Ohio Oil Co. v. Conway,* 279 U.S. 813, 49 S. Ct. 256:

"Where the questions presented by an application for an interlocutory injunction are grave, and the injury to the moving party will be certain and irreparable if the application be denied and the

final decree be in his favor, while if the injunction be granted the injury to opposing party, even if the final decree be in his favor, will be inconsiderable, or may be adequately indemnified by a bond, the injunction usually will be granted. Love v. Atchison, Topeka & Santa Fe R. Co., 185 Fed. 321, 331-332.''

The following is taken from 43 C.J.S., Injunctions, § 19, at page 431:

''The rule has been frequently laid down broadly that a preliminary injunction will not issue where the right which complainant seeks to have protected is in doubt, where the right to relief asked is doubtful, or except in a clear case of right. It has similarly been declared that the right asserted by complainant must be perfectly clear and free from doubt where the effect of a preliminary injunction will be more than merely the maintenance of the status quo. * * *''

■ It will be observed from the passage just quoted that an applicant for an injunction pendente lite must make out a stronger case if the temporary restraining order which he seeks will do more than maintain the status quo. In the case at bar, a grant of the desired relief will not only substitute a new tariff for the existing rates, but will also suspend for an indefinite period an order which the Commissioner entered after a hearing. The situation before us is not similar to that in which a party seeks to enforce a judgment, notwithstanding an appeal, but is one in which a party seeks to have his way notwithstanding an adverse decision. We do not say that in criticism of the relator or of § 112-4,120, O.C.L.A., but only for the purpose of showing the application of the passage which we quoted from the text to the case before us.

As we have said, the Commissioner's findings and his order were before the circuit court when it was called upon to dispose of the motion for a preliminary restraining order. Section 112-453, O.C.L.A., authorized the court to presume that the findings of the commissioner and his disposition of the tariff were correct.

■ Even in the absence of statute, the courts employ presumptions favorable to the regularity of administrative action. In 42 Am. Jr., Public Administrative Law, § 240, p. 680, we find a statement of the rule as it is commonly employed:

"The general rule that in the absence of evidence to the contrary, public officers will be presumed to have properly performed their duties and not to have acted illegally, but regularly and in a lawful manner, is usually applied when regulations, decisions, or orders of administrative officers are challenged in court, and the burden of proving otherwise is upon the party complaining. * * *

"Under the general rule above stated, all legal intendments are in favor of the administrative action. It will be presumed valid, reasonable, correct, taken on knowledge of material facts, justified by the facts, made upon full hearing or after giving all interested parties a reasonable opportunity to be heard, and upon appropriate evidence duly considered and properly applied. Although there are some statements that acts of administrative officers will be presumed to be within the authority conferred upon them, and under some statutes doubts as to jurisdiction and powers must be resolved in their favor, it is generally held that there are no intendments in favor of their jurisdiction. The presumption that administrative officers will follow the law cannot be indulged in where an intention to obey an illegal regulation of a superior administrative officer is not disclaimed, and is admitted by counsel."

*Public Service Ry. Co. v. Board of Public Utility Commrs.*, 276 Fed. 979, gives an excellent delineation of the rule under discussion:

> "On this showing the question is, shall a preliminary injunction issue? In reaching a decision on this question we have been guided by several principles. The first is, that except in very clear cases courts should not, and will not, interfere with rate regulation under state statutes. Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 S. Ct. 192, 53 L. Ed. 382, 48 L.R.A. (N.S.) 1134, 15 An. Cas. 1034. The next is, that in a question of rate making there is a strong presumption in favor of the conclusions reached by an administrative body after a full hearing. Darnell v. Edwards, 244 U. S. 564, 37 S. Ct. 701, 61 L. Ed. 1317. Indeed, one court has gone so far as to say that on an application for a temporary injunction against the enforcement of a rate made by a statutory body every presumption is in favor of the validity of the rate. Kings County Lighting Co. v. Barrett, 276 Fed. 1006, P. U. Rep. N. Y. 1921A, 729.
>
> "Without stopping to discuss its precise weight, it is sufficient to say that we have recognized such a presumption and have applied to it the test given in Wilcox v. Consolidated Gas Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382, 48 L.R.A. (N.S.) 1134, 15 An. Cas. 1034, which is: That to overcome the presumption of the validity of the established rate, the plaintiff company, praying for a temporary injunction must show 'beyond any just or fair doubt' that the action of the Board was 'in fact confiscatory.' "

We see from the foregoing that the Commissioner's findings and order were items of evidence which possessed uncommon cogency. They tended to show that the relator was receiving from its Oregon business a return closely approaching 6% and that its

Oregon earnings had been increasing materially for some months. The findings also showed that the existing rates were established by an order which the Commissioner had made only one year and seven months before the entry of the order which the relator wished suspended. When the court was asked to grant a temporary injunction under a contention that immediate relief was necessary to prevent confiscation, the court had a right to consider the fact that the present return was appreciably more than the rate of 5.5% which two recent orders of the Commissioner fixed as reasonable and which were not subjected to judicial review. Likewise, in determining whether or not a refusal to suspend the Commissioner's order would subject the relator to grave difficulties and irreparable injury, the fact that the relator's Oregon earnings compared favorably to the results it achieved in adjacent states merited attention. Further, in ascertaining whether or not a refusal to put the tariff into immediate operation would deprive the relator of fixed rights, the court could properly consider the fact that the relator supported the tariff with a method of rate making which the Commissioner's unchallenged description termed "novel".

█ Obviously, in considering the relator's motion for an injunction, the circuit court was not called upon to determine the merits of the case which will come before it later. Motions for preliminary injunctions generally call for the exercise of discretion in balancing conveniences, in affording protection against needless injury, in preserving the subject matter of the suit, and not infrequently in preserving the status quo. Since the trial judge is in a superior position to acquaint himself with the situation, the law looks

primarily to him for a proper exercise of the necessary discretion.

In *City of Council Bluffs v. Omaha & C. B. St. Ry. Co.,* 9 Fed. 2d 246, the court said:

> "The power and duty to grant or deny an interlocutory injunction has been entrusted by the law to the judicial discretion, not of the appellate court or of any of its members, but to the court of original jurisdiction, and, unless it clearly appears that the latter court in its action has violated some settled rule of law, or departed from some clear rule or principle of equity established for its guidance, its order or decree in this regard may not be reviewed or changed by the appellate court, without clear proof that it abused its discretion."

See, to like effect, 43 C.J.S., Injunctions, § 13, p. 426.

We do not believe that the issuance of an injunction, preliminary or permanent, is similar to the operation of a mechanical device in which a set of facts is inserted at one place followed shortly by the emerging at another place of the desired injunction. To the contrary, we believe that the issuance of any injunction is dependent upon the exercise by the court of prudent discretion. In the present case, the record before the circuit court afforded ample basis for the exercise of discretion, especially in view of the fact that a grant of the injunction would have suspended an order of the Commissioner which he entered after a public investigation of the contemplated tariff.

Our analysis of the record has revealed nothing whatever in the form "of an act which the law specially enjoined" upon Judge Duncan, and which he failed to perform. The "act" which the relator challenges, that is, the denial of its motion for a preliminary injunction, resulted from the court's exercise of the dis-

crctionary power conferred upon it by statute and ancient procedure. Our statute shields that act from attack by providing that mandamus "shall not control judicial discretion". Mandamus, as we have pointed out, is not a means of overriding judicial discretion nor a device for bringing about its appellate review. When the law assigned to the court's discretion motions for preliminary injunctions, it gave to the court no directions and no charts for its guidance. By discretion the law does not mean personal or individual discretion, but the kind of cautious reasoning in which all chancellors have engaged since the days of Thomas Egerton.

Since the defendant failed to perform no "act which the law specially enjoined" upon him, the writ must fail; therefore, the situation presents no occasion for discussing the defendant's other defense—that is, the availability of normal remedies.

In writing this opinion we have felt a necessity of portraying the facts in only a general way because it seems certain that the same facts ere long will be placed before the circuit court when it reviews the Commissioner's order. We repeat, we have given careful attention to the extensive data submitted in the affidavits and to the earnestness of the company's plea for higher rates. The numerous authorities submitted by the parties were carefully studied. This opinion must not be deemed an intimation of views upon the merits of the proposed tariff.

From the foregoing it follows that the writ must be dismissed. It is so ordered.