No. 40  October 8, 2015  49

IN THE SUPREME COURT OF THE
STATE OF OREGON

OREGON STATE HOSPITAL,
*Relator,*
*and*

STATE OF OREGON,
*Plaintiff,*

*v.*

DANIEL ARMAUGH BUTTS,
*Defendant-Adverse Party.*

(CC 111002; SC S063003)

En Banc

Original proceeding in mandamus.*

Argued and submitted July 1, 2015.

Anna M. Joyce, Solicitor General, Salem, argued the cause and filed the brief for relator. With her on the brief was Ellen F. Rosenblum, Attorney General.

Laura Graser, Portland, argued the cause and filed the brief for adverse party.

Tara Lawrence, Lawrence Law Office P.C., Portland, filed the brief for *amici curiae* Amy Painter, Julie Heuer, Angie Kneeland, Jeremy Howell, Jennifer Birch, Ryan Painter, R.P. (a minor), Kathy Painter, Alan Painter, Manuel Painter, Mashelle Painter, and Bethany Painter. She was joined on the brief by Margaret Garvin on behalf of *amicus curiae* National Crime Victim Law Institute at Lewis & Clark College. With her on the brief were Alison Wilkinson and Amy C. Liu.

BALDWIN, J.

The alternative writ of mandamus is dismissed.

_____

* On petition for a writ of mandamus from an order of Columbia County Circuit Court, Ted E. Grove, Judge.

**BALDWIN, J.**

In this mandamus proceeding, we consider a challenge to the validity of a trial court's *Sell* order directing relator, Oregon State Hospital (OSH), to administer involuntary medication to the adverse party (defendant) in a criminal case for the purpose of restoring defendant's capacity to stand trial on felony charges.[1] For the reasons we explain below, we conclude that ORS 161.370(1) granted the trial court implied authority to issue the order—which was based on the trial court's assessment of all the medical evidence—even though OSH did not agree that administering the medication was medically necessary. We therefore dismiss the alternative writ of mandamus issued by this court.

## I.  BACKGROUND

The pertinent facts in this matter are uncontested. In January 2011, defendant was indicted on 21 felony counts, including nine counts of aggravated murder, for allegedly causing the death of Rainier Police Chief Ralph Painter. Shortly after defendant was indicted, his attorneys became concerned about his ability to aid and assist in his defense. The defense hired a psychiatrist, Dr. Larsen, to evaluate defendant. Larsen concluded that defendant suffered from psychosis and possibly schizophrenia, and recommended that defendant be treated with antipsychotic medication.

Pursuant to ORS 161.365(1)(b), the trial court ordered that defendant be committed to OSH's physical custody so that the hospital could evaluate defendant's ability to aid and assist.[2] Defendant was admitted to OSH for 21

---

[1] A *Sell* order is a court order directing the involuntary administration of antipsychotic drugs to render a defendant competent to stand trial in accordance with the due process requirements enunciated in *Sell v. United State*s, 539 US 166, 123 S Ct 2174, 156 L Ed 2d 197 (2003). *See State v. Lopes*, 355 Or 72, 77-78, 322 P3d 512 (2014) (discussing *Sell*).

[2] ORS 161.365(1)(b) provides:

"(1) When the court has reason to doubt the defendant's fitness to proceed by reason of incapacity as described in ORS 161.360, the court may call any witness to its assistance in reaching its decision. If the court determines the assistance of a psychiatrist or psychologist would be helpful, the court may:

"* * * * *

days in July 2011, where he was evaluated by a hospital psychologist, Dr. Howard. Based on her evaluation of defendant, Howard concluded that defendant did not suffer from a mental disease or defect and that he was able to aid and assist in his defense.

In December 2011, the trial court held a two-day hearing to determine defendant's fitness to proceed. Following the hearing, the court determined that defendant was able to aid and assist. The court noted that various doctors had offered competing medical opinions regarding defendant's mental health. The court also noted that defendant's behavior, although "disturbing," would "support a finding that defendant is gaming the system." Nevertheless, the court indicated that it did not see any reason why defendant should not be provided with the antipsychotic medication that Larsen had prescribed. The court therefore ordered that "such medication be provided to defendant if requested by him or his counsel."

A couple of months later, the trial court ordered that defendant be committed to OSH a second time for inpatient observation and evaluation. Defendant was hospitalized from April 25 to May 10, 2012. Dr. Sethi, a hospital psychiatrist, evaluated defendant and concluded that he did not suffer from a mental disease or defect. Sethi noted that, because defendant had not participated in a detailed interview, Sethi "was not able to conduct a formal assessment of [defendant's] factual and rational understanding of the legal process." However, based on defendant's statements that he did not want to face the death penalty and defendant's description of himself as "clinically insane," Sethi concluded that defendant was aware that he was "facing serious legal charges with the potential for a death penalty."

In February 2013, the trial court held a second hearing to determine defendant's fitness to proceed. Based on the conflicting medical evidence presented at that

---

"(b) Order the defendant to be committed for the purpose of an examination for a period not exceeding 30 days to a state mental hospital or other facility designated by the Oregon Health Authority if the defendant is at least 18 years of age, or to a secure intensive community inpatient facility designated by the authority if the defendant is under 18 years of age."

hearing, the court noted that it remained unclear whether defendant's failure to cooperate with counsel or participate in his defense was a "rational and calculated strategy or the product of a mental disorder." However, the court ultimately determined that "defendant is currently unable to aid and assist in his defense and that such inability is the result of his current[] mental deficiencies, possibly schizophrenia." The court ordered that defendant be committed to OSH for treatment, including the involuntary administration of antipsychotic medication, for the purpose of restoring his capacity to stand trial.

Pursuant to that order, defendant was returned to OSH for a third time in March 2013, where he was evaluated by several doctors. Dr. Stover, a hospital psychologist, evaluated defendant to determine his ability to aid and assist. Stover concluded that defendant did not have a mental disorder or defect that would interfere with his ability to aid and assist and that he was malingering.

Two other doctors, Dr. McCarthy and Dr. Knott, evaluated defendant to determine whether he should be involuntarily administered antipsychotic medication due to his "dangerousness" or "grave disability." *See* OAR 309-114-0020(1)(e) (providing that OSH has good cause to administer medication without patient's informed consent when "[t]he patient is being medicated because of the patient's dangerousness or to treat the patient's grave disability"). McCarthy, an independent physician, diagnosed defendant with a psychotic disorder and recommended that he be involuntarily medicated. Knott, a hospital physician, likewise determined that defendant was showing symptoms of a psychotic disorder and made the same recommendation. Based on those recommendations, the hospital's chief medical officer approved the involuntary administration of antipsychotic medication to defendant.[3]

Although defendant initially requested an administrative hearing to contest the hospital's approval of involuntary medication, he later withdrew his request. An

---

[3] After the involuntary medication was approved, Knott later concluded that defendant did not have a psychotic disorder but did have depression and possibly a personality disorder.

administrative law judge (ALJ) dismissed the hearing request in a written order on May 1, 2013. In that order, the ALJ authorized the hospital "to immediately administer [antipsychotic medication to defendant] without informed consent."

About a month later, when the hospital had not medicated defendant pursuant to the ALJ's order, defendant's counsel sought an order from the trial court to involuntarily medicate defendant. The trial court held a hearing, at which defendant argued that, despite the authorizations from both the trial court and the ALJ, OSH had not administered any antipsychotic medications to defendant. The prosecutor responded that, before a court may order that defendant be involuntary medicated to restore his trial competency pursuant to *Sell*, the court must first make a finding that defendant is mentally ill. The prosecutor contended that the trial court had not made such a finding in this case. At the end of the hearing, the court took the matter under advisement.

In September 2014, the trial court entered a *Sell* order, directing OSH to involuntarily administer antipsychotic medication to defendant for the purpose of enabling him to gain or regain capacity to stand trial. The court relied on the evidence presented at the February 2013 hearing; the court's prior finding that defendant lacked the ability to aid and assist as a result of a mental disease or defect; and a September 2014 affidavit submitted by Dr. Adler, a defense expert. In his affidavit, Adler recommended a treatment regimen of antipsychotic medication designed to restore defendant's capacity to stand trial. The court found that "[t]he recommended treatment is substantially likely to enable Defendant to gain or regain his capacity to stand trial, because administration of the medication to the defendant is medically appropriate, i.e., in the defendant's best medical interest in light of his medical condition." The court therefore ordered defendant to be returned to OSH's physical custody to receive the recommended treatment. The prosecutor and OSH moved to vacate the *Sell* order, and the trial court denied those motions.

On January 16, 2015, the court issued the *Sell* order at issue in this case, reaffirming the court's prior orders and

again ordering OSH to involuntarily administer the recommended antipsychotic medications to defendant. OSH then filed this mandamus proceeding, and this court issued an alternative writ of mandamus.

## II.  PARTY'S ARGUMENTS

In *State v. Lopes*, 355 Or 72, 322 P3d 512 (2014), this court recently granted mandamus relief to a criminal defendant who objected to a *Sell* order that directed OSH to involuntarily medicate him to restore his capacity to stand trial. The court held that ORS 161.370 implicitly authorized the trial court to issue the *Sell* order but also concluded that the particular order at issue did not comply with the due process requirements enunciated in *Sell*. *Id*. at 89, 103. This court provided defendant with mandamus relief to prevent a violation of defendant's due process rights. *Id*. at 103. Thus, the trial court was ordered to vacate its *Sell* order.

In this case, OSH—not defendant—has challenged the validity of the trial court's *Sell* order. That dispute centers on whether the trial court, under ORS 161.370,[4] has the authority to order OSH to involuntarily medicate defendant after making findings based on medical evidence, when OSH does not agree that such treatment is medically necessary. OSH's primary argument is that, "while the trial court has the ultimate authority to determine whether an individual has the capacity to aid and assist at trial [under ORS 161.370], it is within the exclusive province of the hospital to determine whether, and what, medication is necessary to treat mental illness." OSH argues that ORS 161.370 should be interpreted to leave all treatment decisions to OSH, notwithstanding the authority that statute confers on a trial court to issue a *Sell* order when it determines that a defendant is unfit to stand trial.

Defendant argues that ORS 161.370 confers on trial courts the authority to order that a defendant be medicated—whether or not an OSH doctor agrees with that determination. Although defendant is unable to point to a specific provision in ORS 161.370 that expressly confers such authority on trial courts, he argues that this court

---

[4] ORS 161.370(1) to (6)(a) is set out in the appendix to this opinion.

should conclude that ORS 161.370 so provides by implication, relying on *Lopes*, 355 Or at 89 ("By implication, [ORS 161.370] \*\*\* grants trial courts authority to issue *Sell* orders when necessary to enable hospitals to provide that treatment."). Defendant further argues that if trial courts do not have that implicit authority, criminal proceedings could be brought to a standstill whenever OSH disagrees with a trial court's decision that the involuntary medication of a defendant is appropriate.

## III. ANALYSIS

As this court summarized in *Lindell v. Kalugin*, 353 Or 338, 347, 297 P3d 1266 (2013):

"Mandamus is 'an extraordinary remedy' and serves a limited function. *Sexson v. Merten*, 291 Or 441, 445, 631 P2d 1367 (1981). It is a statutory remedy aimed at correcting errors of law for which there is no other 'plain, speedy and adequate remedy in the ordinary course of the law.' ORS 34.110. Importantly, as this court has stated many times, '[i]t has become hornbook law in this state that the writ of mandamus cannot be used as a means of controlling judicial discretion.' *State ex rel. Ricco v. Bigg*s, 198 Or 413, 422, 255 P2d 1055 (1953); *see also State ex rel Douglas County v. Sanders*, 294 Or 195, 198 n 6, 655 P2d 175 (1982) ('Mandamus is not available to review the exercise of trial court discretion.'). Only if the trial court's decision amounts to 'fundamental legal error' or is 'outside the permissible range of discretionary choices' will the remedy of mandamus lie. *State ex rel Keisling v. Norblad*, 317 Or 615, 623, 860 P2d 241 (1993)."

The primary issue presented here is whether the trial court had authority to order OSH to medicate defendant when OSH does not agree that such treatment is medically necessary. *See Lindell*, 353 Or at 347 (mandamus serves limited function of correcting errors of law); *State ex rel Maizels v. Juba*, 254 Or 323, 331, 460 P2d 850 (1969) ("[I]n an otherwise proper case, mandamus may be used to decide disputed and difficult questions of law.").

We begin our analysis with a brief discussion of this court's recent decision in *Lopes. See State v. Cloutier*, 351 Or 68, 100, 261 P3d 1234 (2011) (statutory analysis may be informed by this court's prior judicial construction of same

statute or predecessors). As previously mentioned, in *Lopes*, this court sustained a defendant's due process challenge to the sufficiency of a trial court's *Sell* order directing OSH to involuntarily medicate a defendant after the trial court had found that the defendant was unable to aid and assist. However, before reaching that issue, the court first determined whether ORS 161.370 authorizes trial courts to issue *Sell* orders. After concluding that "trial court authority to issue *Sell* orders must be found in Oregon law," 355 Or at 78, the court observed that the enactment of ORS 161.360 to 161.370 predated *Sell*:

> "Unlike many states, Oregon has not enacted statutes that explicitly grant trial courts authority to enter *Sell* orders or that implement the Court's decision in *Sell*. The Oregon legislature enacted ORS 161.360 to 161.370, the statutes that govern a defendant's incompetence to stand trial, in 1971, before *Sell* was decided. Or Laws 1971, ch 743, §§ 50 to 52. Neither those statutes as originally enacted nor the amendments to those statutes expressly grant trial courts authority to enter *Sell* orders or set forth the criteria that a court should apply when considering whether to grant such an order."

*Id.* at 78-79 (footnote omitted). This court concluded that courts have implicit authority to issue *Sell* orders under ORS 161.370 to order hospitals to involuntarily medicate defendants for the purpose of restoring their fitness to stand trial. *Id.* at 89.

Unlike in this case, as noted above, in *Lopes* it was the defendant who challenged the trial court's authority to order involuntary medication. This court observed that *Lopes* did not involve a situation where the hospital opposed a trial court order directing the involuntary medication of a defendant:

> "The hospital deems that treatment appropriate but has declined to order it because relator refuses it and does not have 'an immediate problem with violence or grave disability related to his own self-care.' Thus, this case does not present the question whether a trial court has authority to order a defendant to be involuntarily medicated when a hospital opposes such treatment. Rather, the question here is whether a trial court has authority to enter a *Sell* order

that will enable a hospital to act in the manner that the hospital determines to be medically appropriate."

*Id.* at 84.

In contrast, the question in this case is whether OSH may disregard a *Sell* order issued by a trial court because OSH does not agree with the trial court's finding that defendant should be involuntarily medicated. Stated differently, was the trial court authorized to order OSH to medicate defendant under the circumstances, and did OSH have a duty to comply with the order? The trial court, on the record, made extensive findings of fact based on medical evidence concerning the issue of defendant's fitness to stand trial. After multiple hearings, the trial court determined that defendant was unfit to proceed to trial, which resulted in the suspension of the underlying criminal proceeding. *See* ORS 161.370(1) - (2) (requiring court to determine issue whether a defendant is fit to proceed and, if not, to suspend criminal proceeding). The trial court found that "it is substantially likely that the medication [that the court has directed] will restore the defendant to competency" and that the "[a]dministration of the medication is medically appropriate, because it is in the patient's best medical interest in light of his medical condition." The trial court made those findings after resolving disputed factual issues based on medical testimony in the proper exercise of its role as factfinder.

As previously stated, mandamus jurisdiction serves a limited function and will not be invoked by this court to control or review judicial discretion. *Lindell*, 353 Or at 347; ORS 34.110 ("A writ of mandamus * * * shall not control judicial discretion."); *see also State ex rel. v. Duncan*, 191 Or 475, 492, 230 P2d 773 (1951) ("Plainly, the legislature intended that mandamus should be an extraordinary remedy. * * * In order to lessen the possibility of being misunderstood, our statute added the words that the writ should never be employed as a means of controlling judicial discretion."); *State ex rel Ware v. Hieber*, 267 Or 124, 128, 515 P2d 721 (1973) (when facts are in dispute, trial court is using judicial discretion to decide the facts and mandamus not available as a remedy to compel trial court to decide disputed facts

in a particular way); *State ex rel. Bethke v. Bain*, 193 Or 688, 703, 240 P2d 958 (1952) (where facts are in dispute, or where no strict rule of law is applicable, exercise of trial judge's sound discretion cannot be disturbed or controlled by mandamus). Thus, mandamus relief is not available to OSH solely based on its disagreement with the trial court's findings of fact.

We therefore turn to OSH's argument that ORS 161.370 does not confer authority on a trial court to order OSH to administer medication when OSH has determined that that treatment is not medically necessary.[5] OSH argues that, under ORS 161.370, it is "within the exclusive province of the superintendent or director to determine what treatment, if any, is necessary for defendant to regain the capacity to stand trial." In so arguing, OSH relies heavily on the provisions of ORS 161.370(5) and (6)(a).

ORS 161.370(5) outlines the superintendent's duty to cause a defendant to be evaluated, to determine defendant's capacity to stand trial, and to notify the trial court of its determinations and the basis for those determinations. Under ORS 161.370(5)(b)(C), when there is a substantial probability that the defendant, in the foreseeable future, will gain or regain the capacity to stand trial, "the superintendent or director shall give the court an estimate of the time in which the defendant, with appropriate treatment, is expected to gain or regain capacity." ORS 161.370(6)(a) further provides that,

> "[i]f the superintendent or director determines that there is a substantial probability that, in the foreseeable future, the defendant will gain or regain the capacity to stand trial, unless the court otherwise orders, the defendant shall

---

[5] OSH has also argued, as a basis for mandamus relief, that the trial court's order is not supported by clear and convincing evidence as required by *Sell*. That evidentiary requirement is one of the due process factors enunciated in *Sell* to protect criminal defendants who object to being involuntarily medicated. OSH focuses its argument on "the fact that the court based its *Sell* order in large part on the opinions of Dr. Larsen and Dr. Adler." OSH's argument regarding the evidentiary standard required by *Sell* is otherwise undeveloped. We therefore view that argument—at its core—to be a disagreement with the trial court's findings of fact. Under these circumstances, we reject OSH's argument without further discussion. *See Ware*, 267 Or at 128 (mandamus not available to compel court to decide facts in a particular way).

remain in the superintendent's or director's custody where
the defendant shall receive treatment designed for the pur-
pose of enabling the defendant to gain or regain capacity."

ORS 161.370(5) and (6)(a) thus describe OSH's responsibil-
ity to evaluate and treat a defendant after a trial court has
found that the defendant is not fit to proceed and has com-
mitted the defendant to the custody of OSH.

However, ORS 161.370(5) and (6)(a) provide only
limited support for OSH's contention that "it is the hospi-
tal, and the hospital only" that has the authority to design
and administer a course of treatment aimed at restoring a
defendant's capacity to stand trial. Paragraph (6)(a) man-
dates that "the defendant *shall receive treatment* designed
for the purpose of enabling the defendant to gain or regain
capacity." (Emphasis added.) That paragraph requires that
a defendant receive treatment, but it does not specify who
must design or administer such treatment. Likewise, sub-
paragraph (5)(b)(C) requires the superintendent or director
of OSH to "give the court an estimate of the time in which
the defendant, *with appropriate treatment*, is expected to
gain or regain capacity." (Emphasis added.). Again, contrary
to what OSH contends, that subparagraph does not allocate
to OSH the exclusive authority to determine what treatment
is "appropriate."

Ultimately, ORS 161.370(5) and (6)(a) do not resolve
the interpretive dispute presented in this case. As this court
observed in *Lopes*, "[n]either [ORS 161.360 to 161.370] as
originally enacted nor the amendments to those statutes
expressly grant trial courts authority to enter *Sell* orders or
set forth the criteria that a court should apply when consid-
ering whether to grant such an order." 355 Or at 79. Thus,
understandably, ORS 161.370—including the provisions on
which OSH relies—does not set forth the relative author-
ity of trial courts and OSH with respect to the treatment
ordered by the trial court in this case. ORS 161.370 does
not explicitly address whether a trial court is authorized
to issue a *Sell* order when an OSH doctor has not recom-
mended the involuntary administration of medication to
restore fitness. Indeed, OSH concedes that ORS 161.370
"is silent" as to what happens "when the court rejects the

hospital's conclusion that the defendant has the capacity to stand trial and instead determines that the defendant, while currently unable to aid and assist, will nonetheless regain that capacity."

In *Lopes*, we concluded that trial courts impliedly have the authority to issue *Sell* orders under ORS 161.370:

> "Under ORS 161.370, trial courts may commit defendants who are unable to aid and assist to a state hospital and the hospital must provide such defendants with 'appropriate' treatment. *See* ORS 161.370(5)(b)(C) (requiring hospital to inform court of time estimate in which defendant, with appropriate treatment, is expected to gain or regain capacity). More particularly, a hospital must provide treatment that is 'designed for the purpose of enabling the defendant to gain or regain capacity.' ORS 161.370(6)(a). *** ORS 161.370 grants trial courts authority to commit defendants to hospitals for treatment that is designed to restore their trial competency. By implication, that statute also grants trial courts authority to issue *Sell* orders when necessary to enable hospitals to provide that treatment.

> "We do not accept relator's argument that the absence of explicit authority to issue *Sell* orders means that trial courts are precluded from acting. ORS 161.370 grants Oregon trial courts and hospitals, acting together in their respective roles, the power to commit and treat defendants so that they will be able to aid and assist at trial. '[W]here a power is conferred by an act, everything necessary to carry out that power and make it effectual and complete will be implied.' *Pioneer Real Estate Co. v. City of Portland*, 119 Or 1, 10, 247 P 319 (1926). *See also Lane Transit District v. Lane County*, 327 Or 161, 168 n 4, 957 P2d 1217 (1998) (citing *Pioneer Real Estate* in support of the proposition that an agency's power to appoint a manager 'carries with it an implied power to fix the terms' of the manager's employment)."

355 Or at 89-90.

As noted, ORS 161.370 does not explicitly confer authority on trial courts to order that a defendant receive particularized treatment. However, ORS 161.370(1) provides: "When the defendant's fitness to proceed is drawn in question, the issue shall be determined by the court." Where,

as here, a trial court has found that a defendant is not fit to proceed based on medical evidence, we conclude that the general authority conferred by ORS 161.370(1), by implication, also confers on trial courts the authority to issue *Sell* orders whether or not an OSH doctor has agreed that the medication ordered is medically necessary. *Lopes*, 355 Or at 89-90; *Pioneer Real Estate*, 119 Or at 10. We limit this holding to the issuance of *Sell* orders only.

We also note that the provisions of ORS 161.370, taken together, reflect a legislative intent for the trial court to have ultimate decision-making authority over fitness proceedings pursuant to that statute. For example:

- the court has the authority, if it determines that the defendant lacks fitness to proceed, to suspend the criminal proceedings, ORS 161.370(2);

- the court has the authority to commit the defendant to the custody of OSH, ORS 161.370(2)(a);

- the court has the discretion to dismiss the charges against the defendant if the court believes that so much time has elapsed that it would be unjust to resume the criminal proceeding, ORS 161.370(4);

- the superintendent and the director are required to provide reports of the defendant's progress to the court, ORS 161.370(5) - (6); and

- the court has the authority to "determine whether there is a substantial probability that the defendant, in the foreseeable future, will gain or regain the capacity to stand trial" and, if not, to dismiss the charges against the defendant or initiate civil commitment proceedings, ORS 161.370(10).

Additionally, provisions of both ORS 161.365 and ORS 161.370 grant the court broad authority, in making a fitness determination, to hold hearings and consider all relevant evidence. In particular, ORS 161.365(1) provides that, when the court has reason to doubt a defendant's fitness to proceed, "the court may call *any* witness to its assistance" in reaching a decision. (Emphasis added.) ORS 161.365 further provides that the court may order that a psychiatrist

or psychologist examine the defendant and prepare a report that recommends treatment necessary to restore capacity. ORS 161.365(1)(a), (2)(d). Similarly, ORS 161.370(1) provides that the court may make a fitness determination based on the report filed under ORS 161.365. If the fitness finding is contested, however, the court must hold a hearing to determine the issue. ORS 161.370(1). Those provisions indicate a legislative intent that the trial court weigh medical evidence and make appropriate determinations regarding a defendant's capacity to stand trial.

The fitness procedures described in ORS 161.370 are intended to facilitate the trial court's ability to make determinations about a defendant's fitness to proceed in the context of a pending criminal proceeding. The trial court must suspend a criminal proceeding if it determines that a defendant lacks the fitness to proceed. ORS 161.370(2). Only when fitness is restored may the criminal proceeding move forward. ORS 161.370(4). ORS 161.370 includes numerous notice and time requirements so that the trial court is timely advised about a defendant's status during the period of time that a criminal proceeding is suspended. ORS 161.370(5) - (6), (8) - (9). Those provisions reflect a legislative intention that the procedures not cause unreasonable delay and, when possible, that the criminal proceeding move forward in a timely fashion.

We therefore reject OSH's argument that the legislature intended, effectively, to grant OSH a veto power in any case in which the hospital disagrees with the court's fitness and treatment determination. The statutory framework makes clear that, in making a fitness determination, the court has the authority to hold hearings and consider all relevant medical evidence—including evidence that contradicts the medical determination made by OSH staff. OSH's position that it has the authority to bring the criminal proceeding to a standstill if it disagrees with the court's fitness and treatment determination creates a stalemate inconsistent with that statutory purpose.

As we noted in *Lopes*, "[t]he procedures prescribed by ORS 161.370 take place within a specific set of time constraints." *Id.* at 82. This criminal proceeding has been at

a standstill since the trial court ordered OSH to medicate defendant in February 2013. Under ORS 161.370—as OSH acknowledges—if the trial court's order in this case were not implicitly authorized, the only remaining options available to the trial court would be to (1) continue to periodically order additional evaluations of defendant (in addition to the three evaluations that OSH has already performed) or (2) dismiss this criminal prosecution without prejudice pursuant to ORS 161.370(10) (so providing if the court determines that there is no substantial probability that defendant, in the foreseeable future, will regain the capacity to stand trial). We do not think that the legislature—in enacting ORS 161.370—intended that a trial court would be limited to those two narrow options under the circumstances presented in this case.

Finally, OSH generally argues that OSH doctors could conceivably object—based on ethical standards—to administering medication to defendant because no OSH doctor has determined that the medication is medically necessary. However, OSH has not demonstrated that no doctor is unable or unwilling to provide treatment to defendant as ordered by the trial court. To the contrary, the record indicates that the involuntary medication ordered by the court was also authorized by OSH's chief medical officer on a different ground. As previously noted, in May 2013, an ALJ authorized OSH "to immediately administer [antipsychotic medication to defendant] without informed consent."[6] That authorization followed the evaluation of defendant by Dr. McCarthy, an independent physician, and Dr. Knott, an OSH physician, who had both recommended involuntary medication due to defendant's "dangerousness" or "grave disability" within the meaning of OAR 309-114-0020(1)(e). The record does not disclose why OSH did not involuntarily medicate defendant pursuant to those authorizations.[7] Moreover, the record is replete with medical evidence supporting the trial court's order. OSH has not shown that it is unable to

---

[6] Defense counsel also agreed that OSH should administer the medication immediately, and counsel has actively pursued that result.

[7] The order issued by the ALJ was valid for 180 days under OAR 309-114-0020(7).

comply with the trial court's order or that compliance would pose an ethical conflict for any OSH doctor.[8]

## IV.  CONCLUSION

We conclude that the trial court's *Sell* order directing OSH to involuntarily medicate defendant was authorized by ORS 161.370 and that mandamus relief is not appropriate in this case. We therefore dismiss the alternative writ of mandamus issued by this court.

The alternative writ of mandamus is dismissed.

---

[8] We respect the expertise and opinions of the OSH doctors who have asserted that the treatment ordered by the trial court is not medically necessary. However, other doctors asserted different opinions, and the trial court based its *Sell* order on those opinions in the underlying criminal proceeding. Pursuant to ORS 161.370(1), it is the trial court's resolution of that factual dispute that controls.

APPENDIX

ORS 161.370, provides, in pertinent part:

"(1)   When the defendant's fitness to proceed is drawn in question, the issue shall be determined by the court. If neither the prosecuting attorney nor counsel for the defendant contests the finding of the report filed under ORS 161.365, the court may make the determination on the basis of the report. If the finding is contested, the court shall hold a hearing on the issue. If the report is received in evidence in the hearing, the party who contests the finding has the right to summon and to cross-examine any psychiatrist or psychologist who submitted the report and to offer evidence upon the issue. Other evidence regarding the defendant's fitness to proceed may be introduced by either party.

"(2)   If the court determines that the defendant lacks fitness to proceed, the criminal proceeding against the defendant shall be suspended and:

"(a)   If the court finds that the defendant is dangerous to self or others as a result of mental disease or defect, or that the services and supervision necessary to restore the defendant's fitness to proceed are not available in the community, the court shall commit the defendant to the custody of the superintendent of a state mental hospital or director of a facility, designated by the Oregon Health Authority, if the defendant is at least 18 years of age, or to the custody of the director of a secure intensive community inpatient facility designated by the authority if the defendant is under 18 years of age; or

"(b)   If the court does not make a finding described in paragraph (a) of this subsection, or if the court determines that care other than commitment for incapacity to stand trial would better serve the defendant and the community, the court shall release the defendant on supervision for as long as the unfitness endures.

"(3)   When a defendant is released on supervision under this section, the court may place conditions that the court deems appropriate on the release, including the requirement that the defendant regularly report to the authority or a community mental health program for examination to determine if the defendant has regained capacity to stand trial.

"(4)   When the court, on its own motion or upon the application of the superintendent of the hospital or director of the facility in which the defendant is committed, a person examining the defendant as a condition of release on supervision, or either party, determines, after a hearing, if a hearing is requested, that the defendant has regained fitness to proceed, the criminal proceeding shall be resumed. If, however, the court is of the view that so much time has elapsed since the commitment or release of the defendant on supervision that it would be unjust to resume the criminal proceeding, the court on motion of either party may dismiss the charge and may order the defendant to be discharged or cause a proceeding to be commenced forthwith under ORS 426.070 to 426.170 or 427.235 to 427.290.

"(5)   The superintendent of a state hospital or director of a facility to which the defendant is committed shall cause the defendant to be evaluated within 60 days from the defendant's delivery into the superintendent's or director's custody, for the purpose of determining whether there is a substantial probability that, in the foreseeable future, the defendant will have the capacity to stand trial. In addition, the superintendent or director shall:

"(a)   Immediately notify the committing court if the defendant, at any time, gains or regains the capacity to stand trial or will never have the capacity to stand trial.

"(b)   Within 90 days of the defendant's delivery into the superintendent's or director's custody, notify the committing court that:

"(A)   The defendant has the present capacity to stand trial;

"(B)   There is no substantial probability that, in the foreseeable future, the defendant will gain or regain the capacity to stand trial; or

"(C)   There is a substantial probability that, in the foreseeable future, the defendant will gain or regain the capacity to stand trial. If the probability exists, the superintendent or director shall give the court an estimate of the time in which the defendant, with appropriate treatment, is expected to gain or regain capacity.

"(6)(a) If the superintendent or director determines that there is a substantial probability that, in the

foreseeable future, the defendant will gain or regain the capacity to stand trial, unless the court otherwise orders, the defendant shall remain in the superintendent's or director's custody where the defendant shall receive treatment designed for the purpose of enabling the defendant to gain or regain capacity. In keeping with the notice requirement under subsection (5)(b) of this section, the superintendent or director shall, for the duration of the defendant's period of commitment, submit a progress report to the committing court, concerning the defendant's capacity or incapacity, at least once every 180 days as measured from the date of the defendant's delivery into the superintendent's or director's custody."