Argued and submitted December 4, 2013, peremptory writ of mandamus to issue March 20, 2014

## STATE OF OREGON,
*Plaintiff-Adverse Party,*

*v.*

## JAMES MICHAEL FRANCIS LOPES,
aka James Michael Francis Lopez,
*Defendant-Relator.*

(CC 120833467; SC S061395)

322 P3d 512

Laura Graser, Portland, argued the cause and filed the brief for defendant-relator.

Leigh A. Salmon, Assistant Attorney General, Salem, argued the cause and filed the brief for plaintiff-adverse party. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Erin C. Lagesen, Assistant Attorney General, Salem, filed a brief for *amicus curiae* Oregon Health Authority. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Julia E. Markley, Perkins Coie LLP, Portland, filed a brief for *amicus curiae* The American Civil Liberties Union of Oregon, Inc. With her on the brief were Kristina J. Holm and Joanna T. Perini.

WALTERS, J.

## WALTERS, J.

Relator seeks a peremptory writ of mandamus directing the Multnomah County Circuit Court to vacate an order authorizing the involuntary administration of medication for the purpose of restoring relator's trial competence. For the reasons that follow, we conclude that, although trial courts have statutory authority to enter such orders, the order that the trial court entered in this case did not comport with the due process requirements of the federal constitution as articulated in *Sell v. United States*, 539 US 166, 123 S Ct 2174, 156 L Ed 2d 197 (2003). Accordingly, we issue the writ.

The uncontested facts are as follows. Relator was arrested on August 16, 2012, and charged with attempted sex abuse in the first degree. ORS 163.427(1)(a)(A). The indictment alleges that relator attempted to subject a person under 14 to sexual contact by attempting to touch a sexual or intimate part of her body. Attempted sex abuse in the first degree is a Class C felony.

Relator remained in jail pending trial, but, on October 4, 2012, the court found reason to doubt relator's fitness to proceed and, after an evaluation, found relator unable to aid and assist in his defense. On November 19, 2012, the court committed relator to the Oregon State Hospital (hospital) to be treated until fit.

On January 2, 2013, the hospital sent the trial court a letter stating that there was no substantial probability that relator would gain or regain the ability to stand trial in the foreseeable future. In the accompanying report, the evaluator specifically stated that *"[w]ithout an ability to provide psychiatric medication interventions* there is no substantial probability that [relator] will regain the ability to proceed within the foreseeable future." (Emphasis added.) Relator was discharged from the hospital and returned to jail.

The court ordered that relator be returned to the hospital for further evaluation; the hospital again informed the court that "the unfortunate reality [is] that we cannot medicate him against his will [because] he does not have an immediate problem with violence or grave disability related to his own self-care."

On February 11, 2013, relator moved to dismiss the charges against him. The court denied the motion "without prejudice." On March 27, 2013, the hospital sent another letter to the court reiterating that there was no substantial probability that relator would regain competency because relator "refuses to take psychotropic medication."

A hearing was set on relator's motion to dismiss. During the hearing, the trial court focused on two issues: first, whether the court had authority to order that relator be involuntarily medicated; and, second, if the court had that authority, whether the state had proved that an order requiring involuntary medication would comport with the constitutional limitations articulated in *Sell*.

As to the first issue, the trial court considered memoranda and arguments presented by both parties and concluded that it had authority to order that relator be involuntarily medicated. The court then heard testimony on the factors required to support an order under *Sell*. Relator's treating psychiatrist testified that there was a substantial likelihood that medication could help relator aid and assist and that administration of antipsychotic medication was medically appropriate. On June 3, 2013, the court entered an order, which we will refer to as the *Sell* order, including the following findings and reaching the following conclusions:

"5. [Relator] is charged with a serious crime against a person or a serious crime against property. *(The facts of the individual case must be taken into consideration and outlined in making this determination.)* The facts are outlined in the State's Probable Cause Affidavit and incorporated herein, as Exhibit 1.

"6. Administration of the medication to [relator] is substantially likely to render [relator] competent to stand trial.

"7. The medication to be administered is substantially unlikely to have side effects that will interfere significantly with [relator]'s ability to assist counsel in conducting a trial defense.

"8. Any alternative, less intrusive treatments are unlikely to achieve substantially the same results.

"9. There are no less intrusive means for administering the medication.

"10. Administration of the medication to [relator] is medically appropriate, *i.e.*, in [relator]'s best medical interest in light of his medical condition.

"11. There are important governmental interests at stake in bringing [relator] to trial, and the involuntary administration of the proposed medication will significantly further those state interests and are necessary to further those interests."

(Emphasis in original; boldface deleted.) The trial court also ordered that relator be medicated in accordance with a list of medications and dosages approved by relator's psychiatrist.

At relator's request, the trial court immediately entered a stay of the *Sell* order to permit relator to challenge it in this court. Relator then petitioned this court for a writ of mandamus directing the trial court to vacate the *Sell* order. This court stayed the trial court's order and issued an alternative writ of mandamus directing the trial court either to vacate the *Sell* order or to show cause for not doing so.

This case presents two distinct questions:

1. Do Oregon trial courts have authority to issue orders authorizing hospitals to involuntarily medicate patients for the purpose of restoring trial competency?

2. If trial courts do have that authority, did the trial court's order in this case comport with the due process requirements of the federal constitution as articulated in *Sell*?

## TRIAL COURT AUTHORITY TO ISSUE *SELL* ORDERS

With regard to the first question, relator argues that *Sell* assumes, but does not grant, judicial authority to issue *Sell* orders, and that, without explicit statutory authorization, trial courts lack that power. Moreover, relator contends, hospital patients have a statutory right to refuse antipsychotic medication, and that right may not be denied for the purpose of restoring competency to stand trial.

In considering relator's arguments, we must analyze the Oregon statutes and administrative rules that apply when a trial court finds a defendant incompetent to

aid and assist at trial and commits the defendant to a hospital for treatment. As context for that analysis, however, we begin with the United States Supreme Court's reasoning in two cases that address an individual's constitutional right to due process when the state seeks to medicate the individual against his or her will: *Sell* and *Washington v. Harper*, 494 US 210, 110 S Ct 1028, 108 L Ed 2d 178 (1990).

The petitioner in *Harper* was a convicted prisoner who had been committed to a mental health facility within the state prison system. When the petitioner refused to take antipsychotic medication, the medical authorities followed a hearing process authorized by the facility's administrative rules and obtained an order that permitted the facility to administer the medication involuntarily.[1] 494 US at 214. The applicable rules permitted the involuntary medication of inmates who were a danger to themselves or others or who were gravely disabled.[2] *Id.* at 215. When the case reached the United States Supreme Court, the Court upheld the facility's order and rejected the petitioner's argument that, because the order impinged on the petitioner's liberty interest, due process required a judicial hearing in addition to the administrative process that the petitioner had been afforded. *Id.* at 222.

In *Sell,* a magistrate judge had committed the defendant to a treatment facility to restore his ability to aid and assist in his defense, and later had entered an order permitting the facility to involuntarily medicate the defendant. 539 US at 171. On appeal, the federal district court determined that the defendant was not dangerous as that term was used in *Harper* but nevertheless affirmed. *Id.* at 173-74. In the United States Supreme Court, the issue was whether due process precluded a court from ordering the involuntary administration of antipsychotic medication to render a defendant competent to stand trial. The Court held

---

[1] In *Harper*, the Court noted that the facility's procedures had been developed in response to the Court's prior decision in *Vitek v. Jones*, 445 US 480, 100 S Ct 1254, 63 L Ed 2d 552 (1980), in which the Court had held that similar procedural protections were required before the government could transfer a prisoner to a mental health facility. *Harper*, 494 US at 215.

[2] "Grave disability" was defined by the administrative rules as a condition that, left untreated, would cause harm. *Id.* at n 3.

that the constitution permits such an order, but "only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests." *Sell*, 539 US at 179. Accordingly, the Court explained, a court must consider four factors and make findings as to each before it approves such an order.[3] *Id.* at 179-84.

Relator correctly argues that *Sell* did not grant trial courts authority to issue *Sell* orders. *Sell* arose as an inter-locutory appeal from a magistrate's order, and the Supreme Court did not have occasion to consider or explore the statu-tory basis for the trial court's authority to issue a *Sell* order. Relator therefore is correct that trial court authority to issue *Sell* orders must be found in Oregon law.

Unlike many states,[4] Oregon has not enacted stat-utes that explicitly grant trial courts authority to enter *Sell*

---

[3] Although the Court in *Sell* did not specifically hold that a court as opposed to a medical facility must make the requisite findings, the Court referred through-out the opinion to findings that "a court" must make. *See, e.g.*, 539 US at 180 ("a court must find that *important* governmental interests are at stake"); *id.* at 181 ("the court must conclude that involuntary medication will *significantly further* those concomitant state interests"); *id.* at 183 ("When a court must nonetheless reach the trial competence question, the factors discussed above *** should help it make the ultimate constitutionally required judgment."). (Emphases in original.)

The federal regulations addressing the treatment of defendants committed because of unfitness to stand trial now require that a court make the requisite findings. As noted in *United States v. Mann*, 532 Fed Appx 481, 487-88 (5th Cir 2013), in 2011 the regulations were "clarified and updated to reflect current case-law." The amendments reflected the understanding of the Bureau of Prisons that, under *Sell*, "[o]nly a Federal court of competent jurisdiction may order the invol-untary administration of psychiatric medication for the sole purpose of restoring a person's competency to stand trial." Psychiatric Evaluation and Treatment, 76 Fed Reg 40229-02 (July 8, 2011); *see also* 28 CFR § 549.46.

[4] *See, e.g.*, California, Cal Penal Code § 1370(a)(2)(B)(ii), (a)(2)(B)(i)(III) (tracking *Sell* factors and requiring court order to involuntarily medicate defen-dant); Connecticut, Conn Gen Stat § 54-56d(k)(2) (permitting defendant to be medicated involuntarily if *Sell* factors established by clear and convincing evi-dence); Illinois, 405 ILCS 5/2-107.1(a-5)(4) (stating factors necessary to permit involuntary medication); Ohio Rev Code Ann § 2945.38(B)(1)(c) (stating fac-tors necessary to permit involuntary medication and requiring court order); Pennsylvania, 50 Pa Cons Stat § 7402(b) (allowing involuntary treatment to restore competency by court order); Utah Code Ann § 77-15-6.5(3) (specifically tracking *Sell* factors).

orders or that implement the Court's decision in *Sell.* The Oregon legislature enacted ORS 161.360 to 161.370, the statutes that govern a defendant's incompetence to stand trial, in 1971, before *Sell* was decided. Or Laws 1971, ch 743, §§ 50 to 52. Neither those statutes as originally enacted nor the amendments to those statutes expressly grant trial courts authority to enter *Sell* orders or set forth the criteria that a court should apply when considering whether to grant such an order.[5] However, the state argues, the broad authority that those statutes do grant to trial courts includes, by implication, authority to issue *Sell* orders in appropriate circumstances. To assess the state's argument, we outline the applicable statutory framework.

Under ORS 161.360(1), if a trial court "has reason to doubt the defendant's fitness to proceed by reason of incapacity," the court may order an examination.[6] The court may call witnesses on the issue or order the defendant to be evaluated by a psychiatrist or psychologist. ORS 161.365.[7]

---

[5] In 1993, the legislature amended ORS 161.370 to bring it into compliance with *Jackson v. Indiana*, 406 US 715, 92 S Ct 1845, 32 L Ed 2d 435 (1972). Testimony, Senate Judiciary Committee, SB 501, Mar 29, 1993, Ex F (statement of Bob Joondeph, Oregon Advocacy Center). *Jackson* held that a defendant committed "solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future." *Id.* at 738. In response to the concern that the statute did not comport with the federal standard, the legislature required that a hospital and a trial court determine whether a defendant is likely to recover capacity, and that, if a defendant is not likely to regain capacity, the defendant be civilly committed or discharged. Or Laws 1993, ch 238, § 3.

[6] ORS 161.360 provides:

"(1) If, before or during the trial in any criminal case, the court has reason to doubt the defendant's fitness to proceed by reason of incapacity, the court may order an examination in the manner provided in ORS 161.365.

"(2) A defendant may be found incapacitated if, as a result of mental disease or defect, the defendant is unable:

"(a) To understand the nature of the proceedings against the defendant; or

"(b) To assist and cooperate with the counsel of the defendant; or

"(c) To participate in the defense of the defendant."

[7] ORS 161.365 provides, in part:

"(1) When the court has reason to doubt the defendant's fitness to proceed by reason of incapacity as described in ORS 161.360, the court may call any witness to its assistance in reaching its decision. If the court determines

The court then must determine whether the defendant is fit to proceed, and, if the issue is contested, hold a hearing. ORS 161.370(1).[8] If the court determines that the defendant lacks fitness to proceed, the court must suspend the criminal proceeding. ORS 161.370(2).[9] If the court decides that the defendant is "dangerous to self or others as a result of mental disease or defect" or that "the services and supervision necessary to restore the defendant's fitness to proceed are not available in the community," the court "shall commit the defendant" to a hospital or another facility designated by the Oregon Health Authority (OHA). ORS 161.370(2)(a).

On commitment, ORS 161.370(5) requires the hospital to evaluate the defendant.[10] Within 90 days of the defendant's

---

the assistance of a psychiatrist or psychologist would be helpful, the court may:

"(a) Order that a psychiatric or psychological examination of the defendant be conducted by a certified evaluator * * * and a report of the examination be prepared; or

"(b) Order the defendant to be committed for the purpose of an examination * * *."

[8] ORS 161.370(1) provides:

"When the defendant's fitness to proceed is drawn in question, the issue shall be determined by the court. If neither the prosecuting attorney nor counsel for the defendant contests the finding of the report filed under ORS 161.365, the court may make the determination on the basis of the report. If the finding is contested, the court shall hold a hearing on the issue. If the report is received in evidence in the hearing, the party who contests the finding has the right to summon and to cross-examine any psychiatrist or psychologist who submitted the report and to offer evidence upon the issue. Other evidence regarding the defendant's fitness to proceed may be introduced by either party."

[9] ORS 161.370(2) provides, in part:

"If the court determines that the defendant lacks fitness to proceed, the criminal proceeding against the defendant shall be suspended and:

"(a) If the court finds that the defendant is dangerous to self or others as a result of mental disease or defect, or that the services and supervision necessary to restore the defendant's fitness to proceed are not available in the community, the court shall commit the defendant to the custody of the [hospital]***[.]"

[10] ORS 161.370(5) provides:

"The [hospital] to which the defendant is committed shall cause the defendant to be evaluated within 60 days from the defendant's delivery into the [hospital's] custody, for the purpose of determining whether there is a substantial probability that, in the foreseeable future, the defendant will have the capacity to stand trial. In addition, the [hospital] shall:

commitment, the hospital must notify the court whether (1) the defendant is presently fit to stand trial; (2) there "is no substantial probability that, in the foreseeable future, the defendant will gain or regain the capacity to stand trial;" or (3) there "is a substantial probability that, in the foreseeable future, the defendant will gain or regain the capacity to stand trial." ORS 161.370(5)(b).

On notification, the trial court must determine whether it concurs and take appropriate action. ORS 161.370(9).[11] If the trial court determines that there is no substantial probability that the defendant will gain or regain the capacity to stand trial in the foreseeable future, the court must either discharge the defendant or initiate civil commitment proceedings. ORS 161.370(10).[12] If the

---

"(a) Immediately notify the committing court if the defendant, at any time, gains or regains the capacity to stand trial or will never have the capacity to stand trial.

"(b) Within 90 days of the defendant's delivery into the [hospital's] custody, [the hospital must] notify the committing court that:

"(A) The defendant has the present capacity to stand trial;

"(B) There is no substantial probability that, in the foreseeable future, the defendant will gain or regain the capacity to stand trial; or

"(C) There is a substantial probability that, in the foreseeable future, the defendant will gain or regain the capacity to stand trial. If the probability exists, the [hospital] shall give the court an estimate of the time in which the defendant, with appropriate treatment, is expected to gain or regain capacity."

[11] ORS 161.370(9) provides:

"When the committing court receives a notice * * * concerning the defendant's progress or lack thereof, the committing court shall determine, after a hearing, if a hearing is requested, whether the defendant presently has the capacity to stand trial."

[12] ORS 161.370(10) provides:

"If at any time the court determines that the defendant lacks the capacity to stand trial, the court shall further determine whether there is a substantial probability that the defendant, in the foreseeable future, will gain or regain the capacity to stand trial and whether the defendant is entitled to discharge under subsection (7) of this section. If the court determines that there is no substantial probability that the defendant, in the foreseeable future, will gain or regain the capacity to stand trial or that the defendant is entitled to discharge under subsection (7) of this section, the court shall dismiss, without prejudice, all charges against the defendant and:

"(a) Order that the defendant be discharged; or

"(b) Initiate commitment proceedings under ORS 426.070 or 427.235 to 427.290."

court determines, instead, that there is a substantial probability that the defendant will gain or regain the capacity to stand trial, then, "unless the court otherwise orders," the "defendant shall remain in the [hospital's] custody where the defendant shall receive treatment designed for the purpose of enabling the defendant to gain or regain capacity." ORS 161.370(6)(a).[13] In that event, the hospital must provide the court with "an estimate of the time in which the defendant, with appropriate treatment, is expected to gain or regain capacity," ORS 161.370(5)(b)(C), and "submit a progress report to the committing court, concerning the defendant's capacity or incapacity, at least once every 180 days." ORS 161.370(6)(a).

The procedures prescribed by ORS 161.370 take place within a specific set of time constraints. No defendant may be committed under ORS 161.370 for a period greater than the maximum period that the defendant could have served if convicted, or for more than three years, whichever period is less. ORS 161.370(7)(a).[14] Further, if at any point the trial court determines that so much time has elapsed that resuming the trial would be unjust, the court must dismiss the charges and either discharge the defendant or

---

[13] ORS 161.370(6)(a) provides:

"If the [hospital] determines that there is a substantial probability that, in the foreseeable future, the defendant will gain or regain the capacity to stand trial, unless the court otherwise orders, the defendant shall remain in the [hospital's] custody where the defendant shall receive treatment designed for the purpose of enabling the defendant to gain or regain capacity. In keeping with the notice requirement under subsection (5)(b) of this section, the [hospital] shall, for the duration of the defendant's period of commitment, submit a progress report to the committing court, concerning the defendant's capacity or incapacity, at least once every 180 days as measured from the date of the defendant's delivery into the [hospital's] custody."

[14] ORS 161.370(7)(a) provides:

"A defendant who remains committed under subsection (6) of this section shall be discharged within a period of time that is reasonable for making a determination concerning whether or not, and when, the defendant may gain or regain capacity. However, regardless of the number of charges with which the defendant is accused, in no event shall the defendant be committed for longer than whichever of the following, measured from the defendant's initial custody date, is shorter:

"(A) Three years; or

"(B) A period of time equal to the maximum sentence the court could have imposed if the defendant had been convicted."

initiate civil commitment proceedings. ORS 161.370(4).[15] Similarly, if the court determines that the defendant has been in the hospital's custody for a period longer than the maximum sentence to which the defendant could be sentenced if convicted, or three years, the court must discharge the defendant or initiate civil commitment proceedings. ORS 161.370(10). Finally, if the defendant does at some point regain fitness to stand trial, and if the defendant is then convicted, any sentence imposed must be reduced by the amount of time that the defendant was in the custody of the hospital prior to trial. ORS 161.370(12).[16]

In arguing that that statutory framework grants trial courts broad general authority to enter orders regarding defendants who are incompetent to stand trial and that that general authority includes the authority to enter *Sell* orders, the state particularly relies on ORS 161.370(6)(a), which, again, provides:

> "If the [hospital] determines that there is a substantial probability that, in the foreseeable future, the defendant will gain or regain the capacity to stand trial, unless the court otherwise orders, the defendant shall remain in the [hospital's] custody where the defendant shall receive treatment designed for the purpose of enabling the defendant to gain or regain capacity."

In the state's view, that provision authorizes a trial court to order a hospital to administer specified treatment designed to enable the defendant to gain or regain capacity, and that

---

[15] ORS 161.370(4) provides:

"When the court, on its own motion or upon the application of the superintendent of the hospital or director of the facility in which the defendant is committed, a person examining the defendant as a condition of release on supervision, or either party, determines, after a hearing, if a hearing is requested, that the defendant has regained fitness to proceed, the criminal proceeding shall be resumed. If, however, the court is of the view that so much time has elapsed since the commitment or release of defendant on supervision that it would be unjust to resume the criminal proceeding, the court on motion of either party may dismiss the charge and may order the defendant to be discharged or cause a proceeding to be commenced forthwith under ORS 426.070 to 426.170 or 427.235 to 427.290."

[16] ORS 161.370(12) provides, in part:

"If the defendant regains fitness to proceed, the term of any sentence received by the defendant for conviction of the crime charged shall be reduced by the amount of time the defendant was committed under this section * * *."

such treatment may include the involuntary administration of antipsychotic medication.

Relator argues that ORS 161.370(6)(a) instructs that the defendant receive treatment at a particular place—a hospital—and, at most, instructs the hospital to provide the defendant with treatment that the hospital deems appropriate. According to relator, ORS 161.370(6)(a) is not a grant of authority to a trial court to determine the requisite treatment. A court has no role in prescribing treatment; a court's role is limited to ordering a defendant's commitment to or release from a hospital.

The question that this case presents lies at the intersection of the parties' arguments. Here, the hospital has determined that the only treatment that· will render relator competent to stand trial is antipsychotic medication. The hospital deems that treatment appropriate but has declined to order it because relator refuses it and does not have "an immediate problem with violence or grave disability related to his own self-care." Thus, this case does not present the question whether a trial court has authority to order a defendant to be involuntarily medicated when a hospital opposes such treatment. Rather, the question here is whether a trial court has authority to enter a *Sell* order that will enable a hospital to act in the manner that the hospital determines to be medically appropriate.

The hospital's position—that without a court order it cannot require relator to be medicated against his will for the sole purpose of rendering him competent to stand trial—accords with the requirements of due process as articulated in *Harper* and *Sell*. As noted, *Harper* holds that a court proceeding is not necessary before a hospital may administer involuntary medication to a patient who is a danger to self or others or who has a grave disability. *Sell* holds that a hospital may administer involuntary medication to a patient who is incompetent to stand trial only if a court makes four specified sets of findings.

Oregon law is consistent with the holdings in those cases. ORS 426.385(3) permits a hospital to administer certain "treatment procedures" without the consent of a "person

with mental illness" in accordance with administrative rule. That statute provides, in part:

> "A *person with mental illness committed to the authority* shall have the *right to be free* from *potentially unusual or hazardous treatment procedures,* including convulsive therapy, *unless* the person has given express and informed consent \* \* \*. This right *may be denied* to a person for *good cause as defined in administrative rule* only by the director of the facility in which the person is confined, but only after consultation with and approval of an independent examining physician."

(Emphases added.)

Accordingly, OHA has adopted administrative rules which provide that all persons who are patients at state institutions for the mentally ill, including those who are committed under ORS 161.370, have a right to refuse antipsychotic medication. *See* OAR 309-114-0005(10) (defining "patient" to mean an individual who is receiving treatment in state mental institution); OAR 309-114-0010(1)(a) (stating that "patients" may refuse significant procedures); OAR 309-114-0005(3) (defining "committed" to mean committed under statutes including ORS 161.370); OAR 309-114-0020(1) (setting out good cause to administer significant procedure without consent to person "committed" to OHA); OAR 309-114-0020(1)(e) (requiring additional findings for patients under ORS 161.370 jurisdiction).[17] Those rules then permit a hospital to deny that right in certain delineated circumstances. At the time that relator was committed to the hospital, *former* OAR 309-114-0010 (2011) specified three instances in which a hospital could administer treatment without a patient's consent: if a patient was legally incapacitated, if

---

[17] The administrative rules apply more broadly than does ORS 426.385(3) and the authority for that broader application is unclear. It could be that the administrative rules recognize that the right to refuse a significant procedure arises from the due process clause of the federal constitution or a federal or state constitutional right to privacy. *See, e.g., Sell,* 539 US at 178; *Harper,* 494 US at 221-22; *Riggins v. Nevada,* 504 US 127, 137, 112 S Ct 1810, 118 L Ed 2d 479 (1992) (discussing the "defendant's liberty interest in freedom from unwanted antipsychotic drugs"). *See also Myers v. Alaska Psychiatric Inst.,* 138 P3d 238, 246 (Alaska 2006) ("Alaska's statutory provisions permitting nonconsensual treatment with psychotropic medications implicate fundamental liberty and privacy interests.").

there was an emergency, or if the hospital determined that "good cause" existed for the denial of a patient's right to consent.[18] Under OAR 309-114-0020(1)(e), "good cause" exists when "the patient is being medicated because of the patient's dangerousness or to treat the patient's grave disability," but not when requested "for the sole purpose of restoring trial competency."[19] Thus, consistently with *Harper* and *Sell,* ORS 426.385(3) and related administrative rules permit a hospital to independently administer antipsychotic medication against a patient's will when the patient is dangerous or gravely disabled, but not when the medication is administered solely to enable the patient to aid and assist at trial. Those restrictions explain why, in this case, the hospital did not administer the antipsychotic medication that it deemed appropriate, but instead informed the court that the administration of that medication was necessary to enable relator to gain capacity.

---

[18] *Former* OAR 309-114-0010 (2011) provided, in part:

"(1)(a) Basic Rule: Patients \* \* \* may refuse any significant procedure and may withdraw at any time consent previously given to a significant procedure. Any refusal or withdrawal or withholding of consent shall be documented in the patient's record.

"(b) Personnel of a state institution shall not administer a significant procedure to a patient unless written informed consent is obtained from or on behalf of the patient in the manner prescribed in these rules, except as follows:

"(A) Administration of significant procedures to legally incapacitated patients as provided in section (6) of this rule;

"(B) Administration of significant procedures without informed consent in emergencies under OAR 309-114-0015; or

"(C) Involuntary administration of significant procedures with good cause to persons committed to the Division under OAR 309-114-0020."

[19] OAR 309-114-0020 provides, in part:

"(1) Good cause: Good cause exists to administer a significant procedure to a person committed to the Division without informed consent if in the opinion of the treating physician or psychiatric nurse practitioner after consultation with the treatment team, the following factors are satisfied:

"\* \* \* \* \*

"(e) Because of the preliminary nature of their commitment, the following additional findings must be made for patients under ORS 161.370 jurisdiction in order to show good cause under this rule:

"(A) Medication is not requested for the sole purpose of restoring trial competency; and

"(B) The patient is being medicated because of the patient's dangerousness or to treat the patient's grave disability."

The question before us is whether Oregon trial courts have authority that hospitals do not have—authority to issue orders that, under *Sell,* permit hospitals to administer appropriate treatment to enable defendants to regain capacity to stand trial. Relator contends that trial courts are subject to the same limitations that ORS 426.385(3) and related regulations impose on hospitals and that those provisions prohibit trial courts as well as hospitals from ordering involuntary medication to restore trial competence.

ORS 426.385(3) was enacted in 1973 as part of revisions to Oregon's civil commitment procedures. Laird C. Kirkpatrick, *Oregon's New Mental Commitment Statute: The Expanded Responsibilities of Courts and Counsel,* 53 Or L Rev 245, 256 (1974). ORS 426.385(3) applies to a "person with mental illness" [20] who is committed to the Oregon Health Authority. [21] In this case, no court has found that relator meets the definition of a "person with mental illness," and no court has civilly committed him. [22] Therefore, it is not

---

[20] ORS chapter 426 was amended in 2013; the amendments, as relevant here, substituted the phrase "person with mental illness" for "mentally ill person" throughout the chapter. *See* Or Laws 2013, ch 360. The definition of that category of persons remains the same and we use the current statutory phrase for ease in understanding.

[21] ORS 426.005(1)(e) defines "person with mental illness" and provides, in part:

"(e) 'Person with mental illness' means a person who, because of a mental disorder, is one or more of the following:

"(A) Dangerous to self or others.

"(B) Unable to provide for basic personal needs and is not receiving such care as is necessary for health or safety.

"(C) A person:

"(i) With a chronic mental illness, as defined in ORS 426.495;

"(ii) Who, within the previous three years, has twice been placed in a hospital or approved inpatient facility by the authority or the Department of Human Services under ORS 426.060;

"(iii) Who is exhibiting symptoms or behavior substantially similar to those that preceded and led to one or more of the hospitalizations or inpatient placements referred to in sub-subparagraph (ii) of this subparagraph; and

"(iv) Who, unless treated, will continue, to a reasonable medical probability, to physically or mentally deteriorate so that the person will become a person described under either subparagraph (A) or (B) of this paragraph or both."

[22] The parties do not dispute that relator is mentally ill; however, being diagnosed as mentally ill is not the same as having been found to be a "person with mental illness" for the purpose of ORS chapter 426. *See* Kirkpatrick, 53 Or L Rev

clear that relator is included within the class of persons protected under ORS 426.385(3).

Furthermore, even if relator is entitled to the protections of ORS 426.385(3), it is not clear that that statute prohibits a trial court from entering an order for involuntary medication. The statute grants a right to be free from certain procedures unless the person has given express and informed consent, but also allows a hospital director to deny that right for good cause as defined in administrative rule. Thus, one interpretation of ORS 426.385(3) is as a limitation on a hospital's independent decisionmaking authority requiring that, when a hospital acts independently, it act only in accordance with administrative rule. Under that interpretation, a hospital would not violate the statute if it were acting pursuant to a court order rather than independently. OHA's administrative rules also can be understood to govern hospitals when they act independently, but not when they act pursuant to court order.

Those are not the only plausible interpretations of ORS 426.385(3) and related regulations; however, we need not resolve that issue for purposes of deciding this case. OAR 309-114-0010 has been amended and now allows hospitals to

at 256 ("The majority of persons generally considered to be mentally ill probably would not fit this new statutory definition.").

Indeed, ORS 161.370 treats civil commitment as an alternative to commitment for the purpose of restoring trial capacity. ORS 161.370(4) illustrates the distinction between a finding that a defendant lacks the capacity to stand trial and a finding that an individual is a "mentally ill person": that statute indicates that one possibility for a court that has determined that a defendant is unfit to proceed is to civilly commit the defendant under the provisions of ORS chapter 426. Because that course of action is optional, rather than mandatory, we know that the legislature did not intend that a finding that a defendant was unfit to stand trial be the equivalent of a finding that that person was a "person with mental illness." *See also Syphers v. Gladden,* 230 Or 148, 157, 368 P2d 942 (1962) (circuit court in one county is not "ousted of its jurisdiction over a person held by it to answer a criminal charge by the finding of another court in a civil proceeding that the person accused of crime was mentally ill").

Under *Sell,* if relator were subject to civil commitment, that could be a reason for a court to refrain from issuing a *Sell* order. In *Sell,* the Court held that the state's ability to civilly commit a defendant was a "special circumstance" that could mitigate the state's interest in bringing the defendant to trial. 539 US at 180 ("[a] defendant's failure to take drugs voluntarily * * * may mean lengthy confinement in an institution for the mentally ill [which] would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime").

administer medication without the consent of a patient "pursuant to a valid court order." OAR 309-114-0010(1)(b)(D). Thus, even if ORS 426.385(3) applies and prohibits a hospital from administering involuntary medication except in accordance with administrative rule, current OHA rules permit a hospital to act pursuant to a valid court order.[23]

Having concluded that ORS 426.383(3) and related regulations do not categorically prohibit Oregon trial courts from issuing *Sell* orders, the question remains whether trial courts have the authority to do so. We conclude that they do. Under ORS 161.370, trial courts may commit defendants who are unable to aid and assist to a state hospital and the hospital must provide such defendants with "appropriate" treatment. *See* ORS 161.370(5)(b)(C) (requiring hospital to inform court of time estimate in which defendant, with appropriate treatment, is expected to gain or regain capacity). More particularly, a hospital must provide treatment that is "designed for the purpose of enabling the defendant to gain or regain capacity." ORS 161.370(6)(a). When a hospital determines that, to fulfill that obligation, the appropriate treatment is the involuntary administration of antipsychotic medication, and that it cannot administer that treatment to comport with due process or statutory or regulatory limitations without a valid court order, then the hospital cannot carry out its treatment obligations unless the court has authority to make such an order. ORS 161.370 grants trial courts authority to commit defendants to hospitals for treatment that is designed to restore their trial competency. By implication, that statute also grants trial courts authority to issue *Sell* orders when necessary to enable hospitals to provide that treatment.

We do not accept relator's argument that the absence of explicit authority to issue *Sell* orders means that trial courts are precluded from acting. ORS 161.370 grants Oregon trial courts and hospitals, acting together in their respective roles, the power to commit and treat defendants so that they will be able to aid and assist at trial. "[W]here a power is conferred by an act, everything necessary to carry

---

[23] Given our disposition in this case, the fact that that amendment did not occur until after the trial court issued the *Sell* order is not a factor in our analysis.

out that power and make it effectual and complete will be implied." *Pioneer Real Estate Co. v. City of Portland*, 119 Or 1, 10, 247 P 319 (1926). *See also Lane Transit District v. Lane County*, 327 Or 161, 168 n 4, 957 P2d 1217 (1998) (citing *Pioneer Real Estate* in support of the proposition that an agency's power to appoint a manager "carries with it an implied power to fix the terms" of the manager's employment). When a hospital determines that involuntary treatment is necessary to enable a defendant to regain trial capacity, we conclude that trial courts have the power to order that such treatment be administered—consistent, of course, with statutory and constitutional limits on the exercise of that power.

### STANDARDS FOR ISSUANCE OF A *SELL* ORDER

We now proceed to the second question: whether the order that the trial court issued in this case comported with the due process requirements of the federal constitution. In *Sell*, the United States Supreme Court explained that two of its prior cases, *Harper* and *Riggins*, had established that an individual has a constitutionally protected liberty interest in avoiding involuntary administration of psychotropic drugs that only an essential or overriding state interest may overcome. *Sell*, 539 US at 178-79. The Court then concluded that the government's interest in bringing an individual charged with a serious crime may be sufficiently essential or overriding when, in light of the efficacy, the side effects, the possible alternatives, and the medical appropriateness of a particular course of antipsychotic drug treatment, the government's need for the treatment is sufficiently important to overcome the individual's protected interest in refusing it. *Id.* at 183.

As a threshold matter, a court must conclude that the involuntary treatment is not otherwise authorized. *Id.* at 181-82. A court need not decide whether forced medication is permissible to restore a defendant's competency if forced medication is warranted for another reason such as the fact that a defendant poses a danger to self or others and may be medicated under *Harper*. *Id.*

If the sole basis for an order for involuntary medication is restoration of trial capacity, a court must make four

findings. *Id.* at 180-82. As the parties acknowledge, a court must conclude (1) that important state interests are at stake in prosecuting the defendant; (2) that medication will significantly further those important state interests, because it is substantially likely that the medication will restore the defendant to competency and substantially unlikely that the medication will cause side effects that will impair the fairness of the trial; (3) that the medication is necessary to further those important state interests, because there are no less intrusive treatments that would produce the same results; and (4) that the administration of the medication is medically appropriate, because it is in the patient's best medical interest in light of his medical condition. *Id.; United States v. Ruiz-Gaxiola*, 623 F3d 684, 687-88 (9th Cir 2010) (summarizing *Sell* factors).

"The *Sell* factors do not represent a balancing test, but a set of independent requirements, each of which must be found to be true before the forcible administration of psychotropic drugs may be considered constitutionally permissible." *Ruiz-Gaxiola*, 623 F3d at 691; *United States v. Hernandez-Vasquez*, 513 F3d 908, 913 (9th Cir 2008) (four findings are "required"). Because of the important liberty interests at stake, to comport with due process an order compelling involuntary administration of antipsychotic medication requires "thorough consideration and justification" and "especially careful scrutiny," and must be based on "a medically-informed record." *Ruiz-Gaxiola*, 623 F3d at 692.

We begin our review of the trial court's application of the *Sell* factors with the threshold issue: whether the order is warranted for a purpose other than restoring relator's fitness for trial. In this case, the hospital determined that relator was not dangerous as that condition is defined in OHA rules and used in *Harper*, and the trial court agreed.[24] Although the trial court did not include in its order an express conclusion that involuntary medication was not otherwise warranted, no party argues to the contrary and the record does not disclose a basis for a different conclusion.

[24] It also is undisputed that relator does not have a "grave disability" as that term is defined in OAR 309-114-0005(11) and used in *Harper*.

We therefore proceed to the first *Sell* factor—the requirement that important governmental interests be at stake. In *Sell,* the Supreme Court explained that bringing a defendant to trial on a "serious" charge is a sufficiently important governmental interest to justify involuntary medication. However, an analysis of the facts of the individual case is required and the government's interest may be lessened by "[s]pecial circumstances," such as the likelihood that the defendant will be civilly committed if he or she is not tried or the fact that the defendant already has been confined for a significant amount of time. 539 US at 180. Accordingly, the Court commented, instances of involuntary medication "may be rare." *Id.*

Federal and state courts generally agree that the question whether a charge is "serious" under *Sell* is a question of law. *See, e.g., United States v. Diaz,* 630 F3d 1314, 1331 (11th Cir 2011); *United States v. Fazio,* 599 F3d 835, 840 (8th Cir 2010) ; *United States v. Green,* 532 F3d 538, 546 (6th Cir 2008); *Hernandez-Vasquez,* 513 F3d at 915-16; *United States v. Palmer,* 507 F3d 300, 303 (5th Cir 2007); *United States v. Bradley,* 417 F3d 1107, 1114, 1116 (10th Cir 2005); *United States v. Gomes,* 387 F3d 157, 160 (2d Cir 2004); *State v. Seekins,* 299 Conn 141, 156, 8 A3d 491 (2010); *State v. Cantrell,* 143 NM 606, 611, 179 P3d 1214 (2008); *State v. Barzee,* 177 P3d 48, 56 (Utah 2007). We agree.

In considering whether a charge against a defendant is "serious," most federal courts have looked to the statutory maximum sentence that may be imposed should the defendant be convicted as an indication of the seriousness with which the legislature views the charge. Some federal courts look only to the potential maximum sentence that a defendant may face if convicted; others also consider the sentence that a defendant would be likely to receive under the United States Sentencing Guidelines (guidelines). The Sixth and Fourth Circuits look to maximum statutory penalties rather than to the guidelines to determine seriousness. *Green,* 532 F3d at 546 (concluding that the guidelines are not an objective measure of a crime's seriousness); *United States v. Evans,* 404 F3d 227, 237-38 (4th Cir 2005) (concluding

that, although consulting the guideline range would "respect legislative judgments," such consultation would be "unworkable because at this stage in the proceedings, there is no way of accurately predicting what that range will be"). The Ninth and Tenth Circuits, however, rely, to varying degrees, on the guidelines to help determine seriousness. *See Hernandez-Vasquez*, 513 F3d at 918-19 (the guidelines are "the best available predictor of the length of a defendant's incarceration"); *United States v. Valenzuela-Puentes*, 479 F3d 1220, 1226 (10th Cir 2007) (considering both maximum statutory penalties and the guidelines).

In most of the cases in which federal courts have considered the constitutionality of *Sell* orders, the crimes charged have been punishable by five or more years in prison, and courts generally have concluded that such crimes are "serious" under *Sell*. *See, e.g., United States v. Nicklas*, 623 F3d 1175, 1178-79 (8th Cir 2010) (maximum statutory penalty of five years); *United States v. White*, 620 F3d 401, 411 (4th Cir 2010) (maximum penalty of over 10 years); *Valenzuela-Puentes,* 479 F3d at 1226 (maximum penalty of 20 years). However, some courts have adopted a categorical approach, deciding that crimes carrying a sentence of more than six months' imprisonment are "serious" under *Sell*. *See United States v. Evans*, 293 F Supp 2d 668, 674 (WD Va 2003); *State ex rel DB*, 214 SW3d 209, 213 (Tex App 2007).

Although the sentence that a defendant may receive is an important and often determinative factor in determining the "seriousness" of charges under *Sell*, a defendant's potential sentence is not the only factor that courts consider. Courts also consider the "nature of the crime." *See, e.g., United States v. Sanderson*, 521 Fed Appx 232, 236 (4th Cir 2013) *cert den*, 134 S Ct 661 (2013) (considering "nature of the crime" to conclude that failure to register as sex offender was "serious" for purposes of *Sell* order); *Hernandez-Vasquez*, 513 F3d at 919 (examining other factors such as prior offenses, predatory nature of offenses, and closeness in time of prior offenses to determine that reentry of deported alien constituted "serious" crime); *Valenzuela-Puentes*, 479 F3d at 1226 (considering "nature or effect of the underlying conduct").

In this case, the trial court's order included a finding that relator was charged with a Class C felony; it did not include a finding as to the maximum sentence for that charge or the sentence that relator likely would face on conviction. Although the determination of whether a crime is "serious" is a question of law, the sentence that a defendant likely will face if convicted may be, in some instances, a question of fact, and it is helpful when a trial court specifically includes both the maximum and the likely sentence that a defendant may face in its *Sell* order. Because this and other questions we later address are issues of first impression, we consult the record for edification.

At the *Sell* hearing, relator represented that, if convicted, he would be "a 7I on the gridblock," which meant that "based on the amount of time he's already had in * * * there is very little the State would be able to do to [relator] if convicted of this crime, because he's almost * * * had an entire year in." The prosecutor agreed that relator's charged offense was a "Level 7 presumptive probation grid." The court stated that "there's little that could be done by way of custody," and added that the penalty that relator was facing "at least in terms of the incarceration that he's facing were he convicted, is minimal * * * [or] nonexistent." From that exchange, it seems that the parties and the court assumed that the maximum sentence that relator would receive at sentencing would likely result in confinement of no more than one year, but that, because relator had already been confined for that period and would receive credit for time served, he would not be sentenced to additional confinement if convicted.[25] *See* ORS 161.370(12); ORS 137.320(4) (pre-conviction incarceration must be credited toward term of sentence). For purposes of this decision, we accept the trial court's understanding.

It also appears from the record that the court based its determination that relator is "charged with a serious

---

[25] Under the Oregon Sentencing Guidelines grid, the presumptive sentence of a person who is a 7I on the grid block is 90 to 180 days with a maximum departure of 18 months. OAR 213-004-0001 through OAR 219-004-0013. Thus, it appears that the maximum sentence that the trial court could have imposed if relator were convicted would be 24 months, or two years. Apparently, however, neither the trial court nor the state believed it likely that relator would receive that sentence.

crime against a person," at least in part on the nature of that crime. The court reasoned that relator is alleged to have attempted to touch an eight-year-old child and that that is a "serious matter" from a public safety standpoint; the court also noted, that, for relator, it is a "serious matter" from a "reputational standpoint." Thus, the court continued, both the state and relator had a significant interest in proceeding to trial.

From our review of the record, we can surmise that relator was charged with a felony that typically carries a sentence not exceeding one year in confinement. Although that charge may not be as "serious," at least in terms of potential sanction, as the charges considered in other cases, it is a charge that, if proved, would establish that relator subjected a child to a substantial risk of harm and would expose relator to significant reputational consequences. On this record, we therefore conclude that the trial court did not commit legal error in concluding that attempted first-degree sexual abuse is a "serious" crime under *Sell*.[26]

The question remains, however, whether, in this particular case, the government's interest in prosecuting relator is lessened by relator's "[s]pecial circumstances." *Sell*, 539 US at 180. In *Sell*, the Court noted that the fact that a defendant "has already been confined for a significant amount of time" may "affect[]" the state's interest in prosecution. *Id*. Accordingly, some courts have relied on the length of pretrial confinement as a basis for holding that *Sell* orders were not justified. For instance, in *United States v. Grigsby*, 712 F3d 964, 974 (6th Cir 2013), the court explained that, prior to conviction, the defendant had been held in detention for a period roughly equivalent to the length of any prison sentence that he ultimately might receive, and that, with credit for the time served, the defendant would not be subjected to additional incarceration or conviction. The court therefore concluded that the government's interest in prosecuting the defendant was diminished such that a *Sell* order was impermissible. Similarly, in *United States v. Weinberg*, 743 F Supp 2d 234, 237-38 (WDNY 2010), the district court

---

[26] During the *Sell* hearing, relator agreed that the crime with which he was charged was "serious" and, in this court, he does not contend otherwise.

found that the government's interest was not sufficient to justify a *Sell* order despite the fact that the defendant was accused of a crime with a five-year maximum sentence. The court reasoned that, because the defendant faced a likely guidelines sentence of six to 12 months in prison and had already spent 21 months in custody, the state's interest in prosecution was so diminished that a *Sell* order could not be upheld.

However, as the state asserts, a government's interest in prosecution is not limited to confinement but also may include rehabilitation, supervision, and deterrence. *See United States v. Gutierrez*, 704 F3d 442, 451 (5th Cir 2013), *cert den*, 133 S Ct 2380, 185 L Ed 2d 1094 (2013) (government's interest in prosecution not extinguished by a defendant's confinement prior to trial because government retained interest in "exacting retribution" against the defendant, "incapacitating" the defendant, "express[ing] society's disapproval of such conduct and potentially deter[ring] others from engaging in it, * * * [and] authoriz[ing] the district court to impose a term of supervised release"); *United States v. Bush*, 585 F3d 806, 815 (4th Cir 2009) (pretrial detainment did not defeat government's interest because prosecution "conveys a message about [the crime's] seriousness and its consequences[,] * * * conviction may subject [defendant] to a period of supervised release[,] * * * [and] the fact of a conviction would create certain limitations on [the defendant's] subsequent activities, such as her ability to obtain and own firearms").

Courts generally consider the question whether the government's interest in prosecution is lessened by a defendant's "special circumstances" such that an order for involuntary medication is not justified in a particular case to be a component of the first *Sell* factor and conduct review for legal error. *See Nicklas*, 623 F3d at 1178 (first *Sell* factor, including whether "special circumstances" existed, reviewed as a question of law); *Fazio*, 599 F3d at 839 (same). However, when underlying facts may bear on that question, some courts have used a sufficiency of evidence standard of review. *United States v. Dillon*, 738 F3d 284, 291 (DC Cir 2013) (reviewing underlying facts for sufficiency); *Evans*, 404 F3d at 236 (same). We agree with that mode of analysis.

In this case, relator has been in custody for what was, at the time of the *Sell* hearing, close to 12 months; he now has been in custody for more than 18 months. At the time of the hearing, relator already had been confined for approximately the same length of time that he would be confined if convicted. Relator now has been confined for an additional six months. Relator argues that that "special circumstance" lessens the state's interest in proceeding to trial, rendering that interest insufficient to justify a *Sell* order. The state counters that relator's conviction would serve governmental interests beyond confinement. Those interests, the state argues, "include the ability to ensure that [relator] receives supervision and treatment in the community if found guilty, thereby assisting [him] in avoiding similar behavior in the future."

The trial court's order does not include factual findings that address either side of that argument. When we look beyond the court's order to the record, we see, as noted, that the trial court recognized that relator's conviction would not advance the state's interest in confinement: the court remarked that the chances that conviction would result in confinement beyond the time that relator already had served were "minimal" if not "non-existent." However, the court observed, conviction could result in probation or "registration." Those measures, the court explained, were "community safety-related measures that would * * * and could be imposed."

Although the record therefore reveals that relator's prosecution and conviction potentially could advance governmental interests beyond relator's continued confinement, the record does not include relevant details about those interests. For instance, there is no evidence about the period of time that relator would be subject to probation,[27] the conditions that would be imposed during probation, or the extent to which relator would be supervised or treated.

---

[27] Under the Sentencing Guidelines Grid, it appears that a person who is a 7I on the grid block typically will receive three years' probation. OAR 213-004-0001 through OAR 219-004-0013. Whether relator would be sentenced to that period of probation is not clear from the record and we hesitate to assume that relator necessarily would be sentenced to probation according to our understanding of the Sentencing Guidelines Grid.

We recognize that the trial court was experienced in such matters and in all probability was aware of or could anticipate or predict that information. However, details about the "community safety-related measures" that the court mentioned do not appear in the record and the state does not argue what those measures might be. What we do know is that by arresting, confining, and treating relator for more than the time that relator would be confined on conviction, the government already has satisfied, to a significant degree, the interests in retribution, deterrence, and rehabilitation that confinement for criminal conduct is intended to achieve.

Although courts have upheld *Sell* orders despite a substantial period of pretrial confinement, the facts in this case are significantly different from the circumstances in those cases. In *Gutierrez*, 704 F3d at 450-51, the defendant was charged with threatening to kill the President, a former President, and a federal law enforcement officer; he was charged based on evidence of over 100 telephone calls made over a two-month period. Each charge carried a maximum sentence of at least five years, and the court observed that the defendant could be sentenced to a maximum of 20 years. The fact that the defendant potentially could receive a lesser guidelines sentence did not persuade the court that the crimes were not serious or that the government's interests were extinguished. *Id.*

In *Bush*, 585 F3d at 809, the defendant was charged with two counts of threatening a federal judge. Each charge carried a maximum 10-year sentence, although the parties agreed that the defendant's sentence under the applicable sentencing guidelines potentially could be no greater than the time that she likely would be confined until competent. *Id.* at 814-15. The court decided that, because a conviction would carry an important message about the crime's seriousness and allow the government to place limitations on the defendant's ability to subsequently acquire a firearm, the government retained an important interest in bringing the defendant to trial. *Id.* at 815.

In those cases, the length of the maximum sentences for the charged crimes, the heightened need for deterrence,

and the specific restrictions that a conviction would allow the government to impose indicated a substantial governmental interest in defendants' convictions, despite the defendants' pretrial incarceration. Here, neither the trial court's order nor the record demonstrates that, after having arrested, treated, and confined relator for more than 18 months, the state's continuing interest in restoring relator's competence and potentially convicting him are so important that they justify relator's involuntary medication. On this record, the first *Sell* factor is not satisfied, and the trial court erred in concluding otherwise.[28]

Although our conclusion on the first *Sell* factor requires vacation of the trial court's *Sell* order, we never-theless proceed to address the remaining *Sell* factors.[29] We do so because our decision today does not preclude the state from seeking another *Sell* order in this or another case in the future, and we think that additional analysis may be of benefit to the bench and bar in that eventuality. We there-fore turn to the second *Sell* factor—whether involuntary medication will significantly further the state's interest in prosecution.

As the state acknowledges, to reach that conclusion, the trial court was required to make two factual findings—that the administration of medication is substantially likely to render relator competent to stand trial and that such med-ication is substantially unlikely to have side effects that will interfere significantly with relator's ability to assist counsel. *See Sell*, 539 US at 180-81 (requiring findings). Because the

---

[28] Even if we had concluded that the first *Sell* factor was satisfied, we none-theless would have vacated the *Sell* order. In *Sell*, the Court required that trial courts make the four sets of findings based on an evaluation of the *Sell* factors in combination, but the Court also stated that those four factors

"should help [the court] make the ultimate constitutionally required judg-ment. Has the Government, in light of the efficacy, the side effects, the pos-sible alternatives, and the medical appropriateness of a particular course of antipsychotic drug treatment, shown a need for that treatment sufficiently important to overcome the individual's protected interest in refusing it?"

539 US at 182. When we evaluate all of the *Sell* factors in combination, on the record in this case, the answer is "no."

[29] We do not, however, find it necessary to reach or discuss *amicus* The American Civil Liberties Union of Oregon's contention that the entry of the *Sell* order in this case violated Article I, section 13, of the Oregon Constitution.

involuntary administration of medication implicates an individual's constitutional liberty interests and carries a risk of error and potential harm in that important context, all of the federal circuit courts that have addressed the issue, as well as many state courts, require the state to prove the necessary facts, including the facts necessary to the second *Sell* factor, by "clear and convincing" evidence. *Dillon,* 738 F3d at 291; *Diaz,* 630 F3d at 1331; *Fazio,* 599 F3d at 840 n 2; *Green,* 532 F3d at 545; *Bradley,* 417 F3d at 1114; *Gomes,* 387 F3d at 160. *See also Seekins,* 299 Conn at 143-44; *Cantrell,* 143 NM at 612; *In re Robert S,* 213 Ill 2d 30, 34, 820 NE2d 424 (2004). We agree that due process requires clear and convincing evidence.

In this case, the trial court's order includes findings that the "[a]dministration of the medication is substantially likely to render [relator] competent to stand trial" and that "[t]he medication to be administered is substantially unlikely to have side effects that will interfere significantly with [relator's] ability to assist counsel in conducting a trial defense." However, the order does not expressly indicate that the court evaluated the evidence presented to determine whether it was clear and convincing. Our review of the record discloses that the trial court "firmly believe[d]" the conclusions that it reached, but that does not tell us that the trial court measured the evidence by the clear and convincing standard that due process requires. Without being able to ascertain that the trial court applied the constitutionally required burden of proof, we conclude that the trial court erred in its application of the second *Sell* factor. *See Bush,* 585 F3d at 816-17 (remanding in part because district court did not appear to have applied clear and convincing standard).

Although we need not further discuss the second *Sell* factor, we are, as noted, cognizant that the issues raised in this case may arise in the future. Accordingly, we mention concerns that we have about the sufficiency of the evidence in this case. It is uncontested that relator suffers from "delusional disorder, persecutory type," a rare form of psychosis, affecting one to two percent of people with psychiatric illness. In both *Ruiz-Gaxiola* and *Bush,* the defendants suffered from that same disorder; both federal circuit courts

held that the evidence on which the trial courts had relied for entry of *Sell* orders was insufficient to permit the orders. *Ruiz-Gaxiola*, 623 F3d at 701; *Bush*, 585 F3d at 816-17. In both cases, government experts testified that involuntary medication would reduce the defendants' delusional thinking and cited a particular study, the Herbel study, to support their conclusions.[30] *Ruiz-Gaxiola*, 623 F3d at 697-98; *Bush*, 585 F3d at 812. Both courts pointed out the weaknesses in the testimony and the study and neither considered the evidence to be sufficient to establish that involuntary medication would be likely to restore the defendant's mental competency. *Ruiz-Gaxiola*, 623 F3d at 701; *Bush*, 585 F3d at 817. Both courts explained that the government must make the required showing with respect to the particular defendant it seeks to medicate and that evidence that antipsychotic medication generally reduces mentally ill patients' delusional thought processes was insufficient to meet the "clear and convincing" standard. *Ruiz-Gaxiola*, 623 F3d at 700; *Bush*, 585 F3d at 816-17. *Accord United States v. Ghane*, 392 F3d 317, 319 (8th Cir 2004) (reversing a *Sell* order for defendant with delusional disorder, based in part on findings that the illness "resists treatment by * * * antipsychotic medication").

Obviously, the sufficiency of the evidence in a particular case depends entirely on the evidence adduced in that case. *See Gomes*, 387 F3d at 161-62 (affirming a *Sell* order for defendant with delusional disorder where the defense did not present expert testimony and both government experts opined that involuntary medication was substantially likely to restore competency). We do not mean to imply that the state cannot establish, by clear and convincing evidence, that the involuntary administration of antipsychotic medication likely will render a person diagnosed with delusional disorder, persecutory type, competent to aid and assist. However, the evidence that was adduced in this case gives us pause.

In this case, the psychiatrist who testified recommended the involuntary administration of specified medications. He acknowledged that the likelihood of success

---

[30] The court in *Bush* cited that study as Byron L. Herbel & Hans Stelmach, *Involuntary Medication Treatment for Competency Restoration of 22 Defendants with Delusional Disorder*, 35 J Am Acad Psychiatry & L 47 (2007).

as a result of that treatment could be as low as 30 to 40 percent, but nevertheless stated his opinion that the medications were "worth trying." In explaining the basis for that opinion, the psychiatrist referred to an article describing a study that, to the best of his recollection, had a sample size of 20 to 30 inmates[31] and to his own experience with the involuntary medication of one patient with a "similar" diagnosis. The psychiatrist also testified that certain medications had known side effects that could affect a patient's ability to communicate, but did not state an opinion as to whether the medications that would be administered to relator would be substantially unlikely to interfere with his ability to assist his counsel in preparing a defense.

The due process clause does not condition a *Sell* order on a psychiatric guarantee of success, and we take no position on whether the evidence adduced in this case was sufficient to support a *Sell* order. We do caution, however, that there may be a cognizable difference between medication that is sufficiently effective to be medically appropriate, and therefore a reasonable choice that is "worth trying" and medication that meets the *Sell* standard. The latter requires that that particular medication be both "substantially likely" to achieve a particular result (a defendant's competency to stand trial) and "substantially unlikely" to cause a particular consequence (side effects that will impair the fairness of the trial). *Sell,* 539 US at 181. When medication is medically appropriate, it often will meet those requirements. However, a trial judge must expressly find the necessary facts to support that determination by clear and convincing evidence.

Like the second *Sell* factor, the third and fourth *Sell* factors—that there is no less intrusive means for administering the medication, and that administration of the medication would be medically appropriate—also require factual determinations supported by clear and convincing evidence. *See Ruiz-Gaxiola,* 623 F3d at 701, 703; *Bradley,* 417 F3d at 1114; *United States v. Payne,* 539 F3d 505, 508-09 (2008) (so concluding). In this case, the trial court's order

---

[31] The psychiatrist did not give the title of the article or the study, but we note that the Herbel study, discussed in both *Ruiz-Gaxiola,* 623 F3d at 697-98, and *Bush,* 585 F3d at 812, was a study of 22 inmates.

reaches those factual conclusions, but neither the order nor the record establish that the trial court evaluated the relevant evidence to determine if it was clear and convincing.[32] Therefore, on this record, we conclude that the trial court also erred with regard to the third and fourth *Sell* factors.

In sum, we conclude that the trial court's order does not meet the four *Sell* requirements and that the trial court therefore erred in entering it. We grant relator's petition and direct the trial court to vacate the *Sell* order.

A peremptory writ of mandamus shall issue.

---

[32] Relator did not argue at the hearing and does not argue here that the government's interest in prosecution is reduced because civil commitment is an available alternative. The state contends that, although it is "very likely" that relator would qualify for civil commitment pursuant to ORS 426.005(1)(e), the availability of that alternative is uncertain. Because neither party suggests that the availability of civil commitment should be a factor in our analysis, we do not consider it.